FEDERAL PRESCRIPTION SERVICE, INC., et al., Plaintiffs,

v.

AMERICAN PHARMACEUTICAL ASSOCIATION, Defendant.

Civ. A. No. 77–1163.

United States District Court, District of Columbia.

Feb. 14, 1980.

George S. Leonard, Alexandria, Va., for plaintiffs.

Arthur B. Hanson, Michael H. McConihe, Washington, D. C., Joel E. Hoffman, C. Coleman Bird, Washington, D. C., for defendant American Pharmaceutical Ass'n.

Richard M. Rindler, Washington, D. C., for former defendant National Ass'n of Retail Druggists (summary judgment granted for this defendant 3/27/79).

Jerry D. Voight, Washington, D. C., James L. Siekmann, Chicago, Ill., for former defendant National Ass'n of Boards of Pharmacy (dismissed as a defendant 6/6/79).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

Federal Prescription Service, Inc. ("Federal"), a mail order pharmacy, and certain of its officers, sue American Pharmaceutical Association ("APhA"), a national organ-

ization of pharmacists, claiming damages resulting from alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("the Act"). Plaintiffs charge that APhA, acting alone or in combination with various named co-conspirators pursuant to anti-competitive policies established by its House of Delegates, restrained and depressed Federal's interstate sales of prescription drugs by mail. After extensive pretrial proceedings, the case was tried to the Court without a jury. Following submissions of proposed findings, briefs, and oral argument, the Court enters its findings of fact and conclusions of law based on the voluminous trial record developed.

### I. Trade and Commerce in Prescription Drugs

Prescription drugs are those drugs which according to federal or state law may be dispensed to the buyer only upon presentation of a valid prescription. Prescription drugs are commodities sold in the course of interstate commerce. These drugs have an annual sales volume of approximately 10 billion dollars. Valid prescriptions are issued primarily by medical doctors and also by veterinarians and dentists. In normal course, prescriptions are filled by licensed pharmacists. There are approximately 125,000 such pharmacists in the United States.

Pharmacists usually operate or are employed by stores serving local communities. These stores compete among themselves in a given area. Some such stores specialize in drug sales, others include pharmacies as part of a more diversified retail service that includes non-drug items. Competition is also provided by labor or other organizations providing drug services for their members, hospital outpatient services, and mail order pharmacies such as Federal. Local pharmacies are principally independents and chain stores. The independents comprise about 60 percent of the total. The balance are mostly chain stores and some hospital pharmacies.

### II. Federal and the Mail Order Business

Federal is primarily a mail order pharmacy that does business throughout the United States operating from its plant and offices in Madrid, Iowa. It is incorporated under the laws of Iowa and commenced its mail order pharmacy business in approximately August, 1963.

The mail order pharmacy is a relatively recent method developed for prescription drug distribution. Although licensed to operate as a pharmacy only by the state or states in which it is located, a mail order pharmacy solicits persons to send it prescriptions by mail from anywhere in the United States and returns the drugs by mail to the buyers. This form of drug distribution became of competitive consequence to the established independents in the late 1950's and early 1960's. The number of mail order pharmacies was never large. Many had a brief existence and few survived for any appreciable period. As far as the record shows there were no new entrants in the 1970's.

Because mail order pharmacies are subject to the delays inherent in the use of the mails, they primarily serve older people who often require long-term medication by what are known as maintenance drugs. Most prescription drugs, including maintenance drugs, are compounded in advance by the manufacturer and accordingly a large number of mail ordered prescriptions can be filled each day by a single pharmacist.

In order to maintain a sufficient volume of prescriptions a mail order pharmacy necessarily seeks to reach customers by advertising and offers discounted prices—at least on some items. The fact that mail order pharmacies rely of necessity on advertising and discounting was well known at all relevant times to APhA and pharmacists generally. A wide variety of choices exists for placing such advertising in national publications, local newspapers and in-house organs of specialized membership organizations, notably organizations willing to sponsor the mail order seller. Customers requiring maintenance drugs are particularly attracted by lower prices.

## III. *APhA*

APhA, the sole defendant in this action,[1] is the national professional society of pharmacists in the United States. It is a nonprofit corporation incorporated and operating under the laws of the District of Columbia. The Association was founded in 1852 and its membership is now approximately 60,000 members from all states and territories, consisting primarily of practicing pharmacists, and including pharmaceutical scientists, pharmacy educators and government-employed pharmacists. Associate membership in APhA is open to any individual not eligible for active membership. Student membership in APhA is open to any undergraduate student enrolled in an accredited school or college of pharmacy. Approximately 15,000 individuals hold student membership in APhA. Approximately one-third of all practicing pharmacists in the United States are APhA members.

APhA encouraged and supported local associations in every state. In seventeen states affiliation agreements with the local associations promoted joint membership in both the local and national association and tended to establish APhA's policies as the standards followed at the local level.

From as early as 1960, APhA's Constitution has outlined in broad general terms its undertaking to promote the interests of pharmacists in the areas of health, education, interprofessional relations, regulations, etc., including the development and maintenance of a Code of Ethics.

APhA policies are established by its House of Delegates. Delegates are appointed by recognized or affiliated state pharmaceutical associations and national associations, and by other divisions of APhA. APhA Trustees, Past-Presidents and Judicial Board members also are delegates. In the interim between House of Delegates meetings, the Board of Trustees is authorized to act for the House of Delegates.

Policy recommendations considered by the House of Delegates are formally initiated by Policy Committees on Public, Organizational and Professional Affairs, consisting of eleven members each. Each Policy Committee's recommendations are subjected to a public hearing before a reference committee, which then submits its own recommendation to the House of Delegates as to whether each policy recommendation should be adopted, rejected or referred back to the Policy Committee by the House of Delegates.

As will be developed in more detail, APhA established a policy of consistent and vigorous opposition to mail order pharmacies. During the relevant period, APhA broadly publicized its concerns regarding mail order pharmacies in speeches by its officers and staff, in its official statements and responses to inquiries, and in its publications.

APhA's publications are used as a means of constantly communicating with APhA's members regarding its policies and activities. Both the *Journal* and newsletter are provided to all APhA members. The *Journal* is distributed also to state pharmaceutical associations.

## IV. *The Alleged Violations of Antitrust Laws*

Federal's claims have been clarified and refined in the normal course of pretrial and trial. Several violations of the antitrust laws are urged in support of Federal's claims for substantial damages. Generally the antitrust violations alleged fall under two broad headings. It is contended that APhA alone and in conjunction with certain co-conspirators

(1) conducted a far-reaching campaign in the nature of a boycott directed to the public, its pharmacist members and health groups generally, specifically designed to discredit mail order pharmacies, including Federal, for the purpose and with the effect of preventing mail order competition with established pharmacy outlets;

1. The original complaint named three other defendants. These were dismissed for various reasons in the course of pretrial proceedings.

(2) encouraged pharmacists, acting through state regulatory boards and other organizations, to bring civil and criminal actions against Federal and its pharmacist Rasmusen, an individual plaintiff, and to implement state laws and regulations designed to hamper or prevent mail order pharmacy sales.

These claims must be further identified and particularized in the light of the proof to determine their legal significance under the antitrust laws and the nature of their effect on the business of Federal.

### V. APhA's Campaign to Discredit and Restrain Mail Order Pharmacies

From as early as 1960, APhA as a matter of its established policy opposed the distribution of prescription drugs by mail. It coordinated its efforts in this regard with other groups, including its own local associations in every state. Although this opposition was usually couched in terms of a concern that mail order pharmacies undermined the pharmacist-patient-physician relationship and thus threatened patient safety or public health, in fact APhA throughout was motivated primarily by its concerns for the economic well-being of its members. The validity of the health concerns, repeatedly expressed, was never satisfactorily supported at trial. Moreover, these concerns in no way justified the generalized indiscriminate attack on all mail order pharmacies which occurred. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 695–96, 98 S.Ct. 1355, 1367–68, 55 L.Ed.2d 637 (1978).

APhA, the National Association of Boards of Pharmacy ("NABP"), and the National Conference of State Pharmaceutical Association Executives ("NCSPAE") held a conference in Washington, D. C., on January 6, 1960, for the purpose of discussing mail order dispensing of prescription drugs. The conference was attended by secretaries of numerous state boards of pharmacy and state pharmaceutical associations as well as representatives of APhA. It was decided to oppose mail order pharmacies. Various recommendations for approaching the mail order prescription situation were made, ranging from the seeking of state and federal laws through legislation or administrative rulings to incorporating a specific statement in the APhA Code of Ethics relating to mail order pharmacy.

The results of this conference were widely publicized and the cooperation of other affected groups such as the National Association of Retail Druggists ("NARD"), and American College of Apothecaries ("ACA") was encouraged.

A report of the 1960 conference was published in the APhA *Journal* in February of that year, and copies of the report were later distributed by NABP to secretaries of its member boards of pharmacy.

In April, 1960, APhA reported in its *Journal* that certain state regulatory agencies, state associations, and other organizations had taken action regarding mail order pharmacies.

APhA adopted a policy condemning the commercial promotion of prescription drugs to the public. This policy and the already established opposition to mail order selling generally were amplified and tightened as time went on.

In May, 1965, a formal resolution read: Resolved: That the Association unequivocally oppose the circumvention of state pharmacy laws, the destruction of the physician-patient-pharmacist relationship and the obvious opportunity for diversion of drugs to illegitimate uses presented by all prescription mail order schemes; and Be it further resolved: That the Association provide guidance to the several state societies to assist them in protecting the welfare of the public from such mail order operations; and Be it further resolved: That the Association again encourage the Congress to review the problems associated with the improper distribution and use of drugs obtained by mail order.

APhA, through various resolutions and revisions of its Code of Ethics as interpreted by its Judicial Board established in 1967, took vigorous steps to establish two major

prohibitory provisions: that pharmacists who participated in any way in mail order selling of prescriptions were unethical, and that advertising of prescription drugs, a course of conduct essential to the mail order method of business, should be condemned and forbidden.

In November, 1968, the Judicial Board held that under the 1960 version of the APhA Code of Ethics eleven forms of discount and price advertising of prescription drugs which had been submitted to it were unethical. None was found acceptable.

In 1969, the Code of Ethics was further particularized to make clear that no member pharmacist could participate in any plan for pharmaceutical service which eliminates the pharmacist-patient-prescriber relationship. This was specifically directed against mail order concerns. This action included a new section that banned any solicitation of pharmacy practice by advertising, reading as follows:

A pharmacist should not solicit professional practice by means of advertising or by methods inconsistent with his opportunity to advance his professional reputation through service to patients and to society.

The 1969 revision also made unethical any continued employment by the pharmacist members of APhA in pharmacies that did not conform to the other requirements of the Code of Ethics, whether or not their employers were pharmacists or were members of APhA. This requirement of the Code was confirmed by a Judicial Board ruling in 1970. In April, 1970, the Judicial Board issued an Advisory Opinion holding that under the APhA Code of Ethics, pharmacist members had to choose between continuing their employment with a non-complying employer and being held responsible for his violations of the APhA Code of Ethics.

In May, 1971, the Judicial Board issued a further Advisory Opinion holding that a pharmacist practicing in a mail order pharmacy would be presumptively deemed to be engaged in unethical conduct within the meaning of the APhA Code of Ethics.

The Code of Ethics as stated or interpreted was a mandatory requirement and obedience to its strictures was specifically identified in APhA's By-Laws as a prerequisite to membership in APhA. At all times relevant to this lawsuit, APhA has been fully aware of the possible antitrust consequences of its Code of Ethics provisions and supporting activities. By 1969 it obtained opinions of counsel warning of potential legal problems prior to the adoption of a Code of Ethics containing the challenged provisions. Following the institution of an action against APhA by the Department of Justice in 1975, challenging the validity of the advertising ban in the 1969 Code of Ethics, APhA further amended its Code of Ethics to limit that prohibition.

Thus, in December, 1975, the flat advertising ban was removed from the Code of Ethics and the following substituted:

A Pharmacist should strive to provide information to patients regarding professional services truthfully, accurately, and fully and should avoid misleading patients regarding the nature, cost, or value of the pharmacist's professional services.

No change has to date been made in the Code to eliminate the nonconforming employer provision or the prohibition on member employment by a mail order pharmacy. These provisions remain in force today.

APhA broadly publicized its opposition to mail order pharmacy in speeches, publications, official statements, and responses to inquiries. APhA's chief executive officer, Apple, and other officials speaking throughout the country, continuously criticized the solicitation of professional pharmacy practice by means of advertising. APhA wrote letters to consumer-type publications, urging them not to publish mail order advertising and attempting to discourage possible entrants into the mail order pharmacy business. The Code of Ethics and resolutions adopted by the APhA House of Delegates were published and disseminated to pharmacists and others through APhA's monthly *Journal*, through official bulletins and newsletters issued periodically, through staff correspondence, and through speeches

made by APhA officials to state and local pharmacy associations and boards, student groups and other health-type organizations. The Code and resolutions attained further prominence in the course of APhA's on-going support for or opposition to legislation and litigation concerning mail order pharmacy issues.

Among the claims made against mail order pharmacies, none of which was shown to apply to Federal, were claims of illicit drug traffic, delay in filling prescriptions, use of nonprofessional personnel, lack of accessibility of prescription files, and failure to work with the prescribing physician.

Partly as a result of APhA's efforts, 18 state associations adopted the APhA Code of Ethics, six state boards of pharmacy adopted it by reference as a code of professional responsibility governing all licensed pharmacists in such states, 16 states adopted laws or regulations forbidding mail order practice, and 30–35 states adopted laws or regulations prohibiting the advertising of prescription drugs. The exact extent of APhA's responsibility for these developments either because of its direct actions or those of others collaborating with APhA was not established. It is not disputed, however, that each of these developments was entirely consonant with APhA objectives; and it may be fairly inferred from all the evidence that the actions of APhA and its collaborators were at least indirectly responsible for some of the above-mentioned effects.

## VI. APhA's Enlistment of Third Parties in Opposition to Mail Order Pharmacies

APhA also attempted to enlist the aid of other organizations to act against mail order pharmacies. In 1960, for example, APhA, acting jointly with the National Association of Retail Druggists ("NARD"), persuaded the American Medical Association ("AMA") to adopt a resolution calling upon doctors to encourage their patients, except in rural sections, not to use mail order prescription services. Liaison with organized medicine was continued thereafter and APhA asked its members to write articles for local medical journals decrying the use of mail service pharmacies.

APhA also urged pharmacy students in all accredited schools to avoid employment in mail order pharmacies and took steps to inculcate students with its Code of Ethics.

## A. The Co-Conspirators

A principal effort of APhA has been to unify all aspects of pharmacy retailing so that the pharmacy industry would, as APhA describes it, speak with one voice. A number of organizations also opposed mail order sale of prescription drugs. Generally speaking, Federal has claimed that all such organizations should be considered co-conspirators. It is clear that APhA sought to persuade others, like AMA, to its point of view, but proof of conspiracy requires more than this. APhA's actions were primarily economically motivated and were consciously designed to inhibit or prevent mail order competition for the benefit of its pharmacist members. Only those organizations or individuals shown by the proof to have supported or collaborated with APhA for this purpose can be said to have joined knowingly to further the objects of the conspiracy alleged. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 44–45, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226–27, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939).

*State associations* of APhA were all shown to be co-conspirators. Each state pharmaceutical association "recognized" by APhA has a right to designate two voting delegates to the APhA House of Delegates. By vote in that House the states collectively have been the moving force in the adoption of the restrictions complained of in this case. They have authorized the dissemination and effectuation of these anticompetitive and exclusionary policies through APhA publications and APhA methods of enforcement. The chief administrative officials or executives of all state pharmaceu-

tical associations constitute what is known as "NCSPAE" which meets annually and which co-sponsored the 1960 Conference that resolved to oppose mail order pharmacies. Furthermore, 17 state pharmaceutical associations at the time of the filing of this action have had compulsory dual membership agreements whereby all applicants for state association membership are required to abide by the APhA Code of Ethics and usually to become APhA members. Such state associations are said to be "affiliated" with APhA. The earliest such affiliation was in 1962 (Michigan). Iowa became affiliated as early as 1964. In Iowa, out of 1,600 practicing pharmacists, 1,000 are members of the state pharmaceutical association, of which 600 are members of APhA.

Affiliated state associations play an even larger part in the determination of APhA policies. Such states are given one voting delegate in the House of Delegates for each 200 APhA member pharmacists residing in the state. Affiliated states act to further APhA objectives, receive special materials written by the APhA staff for republication in local pharmaceutical journals, and their chief administrative officials are not only members of NCSPAE but are part of an affiliated administrative group ("NCASPAE") that meets separately with APhA officials on an annual basis at APhA headquarters in Washington, D. C.

*NABP* was also a co-conspirator. NABP, a private organization, is managed by an Executive Committee consisting of NABP officers, the immediate past president, and three elected members who direct the Association's executive director-secretary and staff. NABP membership consists of the present and former members of the respective boards of pharmacy of each of the states and territories of the United States and four Canadian provinces. In at least 14 states, such board members were required by state law to be selected from the membership of the corresponding state association of state pharmacists. In many other states, such board members were required to be selected by the respective state governors from lists prepared by the local state pharmaceutical association. Such boards of

pharmacy control the licensing of all pharmacies and pharmacists in their states and have the authority to issue regulations governing pharmacists' practice. A majority of the NABP members own or operate local pharmacies. Until 1974, NABP by charter requirement convened annually at the same time and location as the APhA convention.

NABP has assisted APhA directly in the effectuation of its policies against mail order distribution and prescription drug advertising. NABP was aware of APhA's economic objectives. NABP cooperated with APhA in setting up an industry meeting in January, 1960, to determine what steps should be taken to oppose mail order drug distribution. Representatives from a number of state boards were present at the meeting at which time all state boards were asked to use every legal method to oppose the establishment of mail order houses. In 1962, APhA reported that 16 state boards had responded to its plea by issuing cease-and-desist orders to mail order houses. NABP thereafter adopted resolutions opposing mail order drug distribution and drug advertising and sent copies of these to all of its members. APhA materials opposing mail order pharmacy and drug advertising were sent to NABP and republished by the latter to its members.

*ACA* was also a co-conspirator. ACA is a national association whose membership consists of owners of pharmacies that engage only in the dispensing of prescription drugs and the sale of over-the-counter drugs, medical devices, and health-related items. Within the period from 1960 to 1976, ACA was an affiliated national organization with APhA and was therefore entitled to appoint representatives to its House of Delegates. In or about 1960, ACA joined with APhA in opposing the distribution of prescription drugs by mail.

*Apple*, the chief executive officer of APhA was also a co-conspirator. He spearheaded APhA's opposition to mail order sales and was a vigorous opponent of mail order pharmacies. He travelled throughout the country to make speeches on behalf of

APhA, and wrote numerous articles in which he constantly attacked mail order pharmacies and emphasized the need to uphold the Code of Ethics and rulings of the Judicial Board. Mail order prescription was pictured as a "scheme" that threatened to destroy community pharmacy service. Pharmacists were told they were fighting for economic survival and the opportunity to earn a living. Price-cutting was said to be a gimmick for conning the public. Advertising was described as professionally improper. Pharmacists were urged to alert physicians and regulatory officials as well as other pharmacists to the danger perceived. In this fashion, with the aid of APhA's publications, Apple largely succeeded in uniting the profession to a concerted opposition to mail order pharmacies.

*The Iowa Board of Pharmacy* and its members were co-conspirators. The actions taken by the Board in collaboration with the Iowa Association against Federal followed APhA's action proposals and were taken to further APhA's objectives, often without regard to the requirements of Iowa law.

Until a recent change in state law, all Iowa Board members were required to be selected from a list prepared by the Iowa Association and sent to the Iowa governor and were in fact Association members. The Association adopted the APhA Code of Ethics as its own, republished interpretive opinions of the Judicial Board and circulated them to all of its members whether or not members of APhA. It also submitted questions to APhA's Judicial Board for further interpretations of the Code of Ethics, established a Grievance Committee to enforce compliance with the Code of Ethics and called on the Missouri Board of Pharmacy to take action against Getz Prescription Company, a mail order pharmacy, to prevent its filling prescriptions from Iowa residents. The Iowa Board members were members of NABP which, as indicated, took actions against Federal.

In 1962 the members of the Iowa Board of Pharmacy were reluctant to issue an original pharmacy license to Federal and only granted it in 1963 after the Attorney General of that state informed the Board that no state law existed which would prevent the issuance of a pharmacy license to a mail order house. The Iowa Board, in addition to impeding the original issuance of Federal's pharmacy license, delayed the granting to Federal of a change of address license in 1964 and withheld its annual relicensing in 1970. The Board attempted to seize Federal's stock of drugs, imposed unusual and burdensome inspection conditions on it, and cooperated with the Iowa Pharmaceutical Association and the Nebraska Pharmaceutical Association in preparing forged prescriptions which were then sent to and filled by Federal. On the basis of these filled prescriptions the Iowa Board revoked Federal's pharmacy license, forcing it to turn to the Iowa courts to compel its license to be restored. Subsequently, the members of the Iowa Board of Pharmacy arranged for the state to bring suit against Federal to prevent its filling out-of-state prescriptions, and administratively denied Federal the right to employ pharmacist interns because of its nonmembership in the Iowa Pharmaceutical Association. Although the possible protected status of some of these activities is discussed below,[2] it is clear that collectively they constituted a course of conduct which adversely affected Federal's business.

All of the above co-conspirators acted primarily if not exclusively for economic anticompetitive reasons. Any proffered explanations addressing substantial public health or safety concerns were not adequately supported by the evidence, either as to the validity or sincerity of the concerns expressed.

Federal also claims that other state boards of pharmacy in addition to the Iowa Board were co-conspirators. The proof will not support this claim. Similarly the proof

---

2. *See* p. 1209 *infra*, discussing applicability of the *Noerr* doctrine to the activities of the Iowa Board.

failed as to all others claimed to be co-conspirators.

## B. *Forged Prescriptions*

All pharmacies may receive false or forged prescriptions and must take precautions to prevent filling them inadvertently. Mail order pharmacies are more removed from the prescribers and must take extra precautions. Federal did this. Its record on this score was excellent. Indeed, mail order pharmacies generally showed up better than independent pharmacies in this regard during a somewhat haphazard survey conducted in 1972.

Due to the continuing possibility that its pharmacy license might be revoked, Federal instituted procedures to assist it in identifying forgeries. These took up the time of one or two clerical employees, the cost of establishing and updating a physician signature register, telephone expense, and the organization and maintenance of a physician control drug number registry required by law enforcement authorities.

Aware of the possible vulnerability of mail order pharmacies to forgery, steps were taken by opponents of mail order to cause Federal to fill forged prescriptions.

*Arkansas*: In the spring of 1973, the Chief Inspector of the Arkansas Board of Pharmacy, working in conjunction with an Arkansas Grand Jury, submitted forged prescriptions to various mail order and community pharmacies both within and without the State of Arkansas, including Federal and the AARP[3] Pharmacies in Washington, D.C., and Kansas City, Missouri. Pharmacists at Federal and AARP, among others, filled these prescriptions. As a consequence of Federal's filling the forged prescriptions, its pharmacist Rasmusen was twice arrested and jailed for the purpose of extraditing him to Arkansas, but the Governor of Iowa refused extradition. Efforts to extradite AARP pharmacists were also made without success.

Following Arkansas' attempts to extradite Rasmusen and pharmacists employed at AARP, NABP carried in its publications a report of the activities of the Arkansas Grand Jury.

*Nebraska/Iowa*: In February, 1964, Burke, a pharmacist located in Grand Isle, Nebraska, notified the Nebraska Pharmaceutical Association that Federal was soliciting mail order prescriptions in Nebraska and expressed his concern that the Iowa Board of Pharmacy would permit this type of pharmacy practice within its jurisdiction. This letter was forwarded to the Iowa Pharmaceutical Association, which advised Burke of the activities undertaken by the Iowa Board with respect to Federal. The Iowa Association suggested that Burke seek a cease-and-desist order from the Nebraska Board of Pharmacy.

In further correspondence with Burke the Iowa Association suggested that he arrange to have a bogus prescription written by a practicing physician and sent to Federal, and that he might have a teenager write a forged prescription and send it to Federal to see if it would be filled. Thereafter, the prescriptions were prepared and sent as suggested, and were filled by Federal. All of the information was forwarded to the Iowa Association by Burke. The Iowa Association submitted this information to the Iowa Board with a request that it take enforcement action.

On the basis of the information obtained from Burke, and other information available to the Iowa Board regarding allegations of false and deceptive advertising by Federal, the Iowa Board initiated proceedings in late 1964 or early 1965 to revoke Federal's retail pharmacy license, and thereafter it did so. Federal, while continuing its business, filed suit in the Iowa state court to require the Pharmacy Board to reinstate its license. It prevailed, and on November 10, 1965, the state court issued a decree, annulling the revocation of Federal's license, but warning Federal to cease using false adver-

---

**3.** The mail order prescription drug service that operates for the exclusive benefit of the American Association of Retired Persons ("AARP") and the National Retired Teachers Association has been in operation at all times relevant to this lawsuit.

tising and to use greater care in its efforts to detect forged prescriptions.

Dr. Linwood F. Tice, President-elect of APhA and Dean of the Philadelphia College of Pharmacy and Science testified as a witness in the Iowa state court proceeding on behalf of the Iowa Board.

### C. *The Massachusetts Suit*

It was possible for some states with restrictive laws to obtain cease-and-desist orders *ex parte* against Federal and other mail order concerns. Although 15 states issued such orders and they were widely publicized by APhA, the orders were ignored. Mail order sales and advertising by out-of-state mail order concerns continued into cease-and-desist order states.

APhA prepared an extensive legal brief in 1965 and early 1966, proposing various legal theories that might be urged to provide more effective opposition to mail order pharmacies. Such theories were then presented by APhA to a meeting of the NABP Board Secretaries, and NABP published the brief in its proceedings, sending it to all boards. In addition, APhA circulated the brief to the state associations.

In December, 1967, the Massachusetts Pharmaceutical Association and five member pharmacists practicing in Massachusetts filed suit in Massachusetts state court against Federal and later obtained a declaratory judgment to the effect that Federal's mail order activities constituted the practice of pharmacy in Massachusetts without complying with Massachusetts licensing laws. Massachusetts prescriptions were being filled by a pharmacist from Iowa who was not licensed in the state. Thereafter, these plaintiffs obtained an injunction against Federal directing it to cease its business activities in Massachusetts unless it properly registered under Massachusetts law. Neither the declaratory judgment nor the subsequent injunction was contested by Federal, which did not appear in the Massachusetts proceedings.

The Massachusetts Association requested that APhA provide funds for the purpose of taking the Massachusetts judgment to Iowa

under the "Full Faith and Credit Clause" for enforcement in Iowa. APhA agreed to do so.

In the interim, the Director of APhA's Legal Division sent a request to approximately 14 state associations requesting that they meet to discuss the action by the Massachusetts Association. A meeting was finally arranged and held in Kansas City, Missouri, in October, 1968. Approximately four attorneys attended, including a representative of the Iowa Association.

NABP noted in its minutes that its staff was to give support to the Massachusetts Pharmaceutical Association suits against Federal in the Iowa courts, even though NABP knew at the time that the Massachusetts suit was solely economic in character and had been instituted primarily for the purpose of eliminating Federal's price competition with the Massachusetts Association members.

Following APhA's agreement to cover legal fees and expenses, counsel for the Massachusetts plaintiffs brought the case to Iowa by filing a complaint in the United States District Court for the Southern District of Iowa. The firm serving as local counsel for plaintiffs was paid by APhA.

The federal court dismissed the action in July, 1969, holding that the Massachusetts plaintiffs could not establish the necessary jurisdictional amount to maintain their action in federal court. The plaintiffs appealed and the Eighth Circuit affirmed the lower court in an opinion issued in 1970.

The Massachusetts plaintiffs then filed their complaint in the Iowa State Court at Boone County, Iowa. Following at least one change of judge and a hearing on the merits, the state court in June, 1977, issued a decision refusing to enforce the Massachusetts injunction.

After a review of the decree in 1977, and consultation with counsel, the Massachusetts plaintiffs and APhA determined not to pursue the case further.

### VII. *Liability*

■ Practices challenged by Federal directly affected the commerce between the

states in prescription drugs. *See Northern Cal. Pharmaceutical Assn. v. United States,* 306 F.2d 379, 386–87 (9th Cir.), *cert. denied,* 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962); *United States v. Utah Pharmaceutical Assn.,* 201 F.Supp. 29, 33 (D.Utah), *aff'd,* 371 U.S. 24, 83 S.Ct. 119, 9 L.Ed.2d 96 (1962). The proof clearly shows a group boycott arranged primarily for economic anticompetitive reasons among conspirators with sufficient power and influence in the market to make it effective. In addition to general opposition to mail order pharmacies the boycott was specifically directed against Federal. The conduct of APhA and its co-conspirators had the intended and necessary effect of excluding or impeding Federal and other mail order pharmacies from access to retail customers. Such conduct, as delineated by the findings, constituted a *per se* violation of Section 1 of the Sherman Act. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *See also National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

Elements of the boycott also were prohibited by the Act, given the factual circumstances in which they arose. These prohibited elements include the ban on advertising during most of the relevant period, *see National Society of Professional Engineers v. United States, supra,* 435 U.S. at 692–96, 98 S.Ct. at 1365–67; *Gough v. Rossmoor Corp.,* 487 F.2d 373, 376 (9th Cir. 1973); *United States v. National Funeral Directors Assn.,* 1968 Trade Reg.Rep. (CCH) ¶ 72,529 (E.D. Wis.1968) (Consent Decree), the concerted opposition to discounting, *see United States v. General Motors Corp., supra,* 384 U.S. at 144–47, 86 S.Ct. at 1330–31; *United States v. Parke, Davis & Co.,* 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–513, 4 L.Ed.2d 505 (1960), and the restrictive applications of the Code of Ethics affecting non-members as well as members, *see National Society of Professional Engineers, supra,* 435 U.S. at 692–96, 98 S.Ct. at 1365–67; *United Mine Workers v. Pennington,* 381 U.S. 657, 668, 85 S.Ct. 1585, 1592, 14 L.Ed.2d 626 (1965); *Mardirosian v. American Institute of Architects,* 474 F.Supp. 628, 647 (D.D.C.1979).

From the outset APhA has urged that most if not all of its activities fall outside the strictures of the Act because they were protected by the First Amendment to the Constitution. This defense brings into focus the doctrine first announced by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (*"Noerr"*). The Court reviewed *Noerr* and its progeny in the context of this case in an earlier summary judgment proceeding. *See Federal Prescription Service, Inc., v. American Pharmaceutical Assn.,* 471 F.Supp. 126 (D.D.C.1979). That discussion of the *Noerr* doctrine is incorporated herein by reference.

■ APhA's claim for blanket immunity under *Noerr* is far too broad. The events reviewed above regarding opposition to advertising and discount pricing and implementation of the Code of Ethics do not come under the protection of *Noerr.* These activities, undertaken purely among private entities such as defendant and other trade associations, fail to implicate First Amendment concerns. *See National Society of Professional Engineers v. United States, supra,* 435 U.S. at 697–99, 98 S.Ct. at 1368–69. Nor does Federal's attack on these efforts to influence or control private, non-governmental conduct in any way impinge upon APhA's right to seek redress before legislative bodies, governmental agencies or courts.

■ It should be noted that APhA and its co-conspirators did engage in legislative efforts to thwart mail order pharmacies at both the federal and state levels. In addition, they urged Federal Government agen-

cies to enforce existing regulations in the hope that such enforcement would limit mail order business. The nature and extent of these activities are not shown on the record. As far as appears they were not sham. No illegal lobbying practices or other misuses of the legislative or administrative processes have been demonstrated. The Court considers these activities fully protected by the *Noerr* doctrine.

Certain conduct found in the record, however, notably the state licensing and regulatory proceedings in Iowa, the forged prescription actions initiated in Arkansas and Nebraska, and the Massachusetts-Iowa litigation, raises serious issues under the *Noerr* doctrine. Because plaintiffs cannot recover for damages resulting from genuine *Noerr*-protected conduct even if undertaken by a co-conspirator, these *Noerr* issues require analysis before turning to plaintiffs' damages claims.

■ Under the *Noerr* doctrine, genuine individual or concerted action undertaken before legislative bodies, administrative agencies or courts is absolutely immune from antitrust liability. *See United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Noerr, supra*, 365 U.S. at 136–38, 81 S.Ct. at 529–30. The "genuine" quality of the challenged activity is not automatically impugned by evidence that defendant's ultimate or exclusive intent is to restrain competition or that an identifiable result of defendant's conduct is injury to plaintiff's business. *Id.* at 138–44, 81 S.Ct. at 530–33. In limited circumstances, however, a competitor's political or litigative activities may cease to be protected as genuine but instead become identified as a "sham." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 379–80, 93 S.Ct. 1022, 1030–31, 35 L.Ed.2d 359 (1973); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511–15, 92 S.Ct. 609, 612–14, 30 L.Ed.2d 642 (1972). Such activities constitute a sham if undertaken with the intent either to bar another competitor from having meaningful access to the relevant governmental body or to abuse the processes by which that governmental body functions. *See, id.*, at 512–15, 92 S.Ct. at 612–14.

■ The Massachusetts-Iowa litigation is clearly entitled to *Noerr* protection. Filed in 1967 to enforce rights under extant state law, the action was prosecuted openly in two states. There can be no showing that the claim was baseless or frivolous; indeed the state association was initially successful in state court under Massachusetts licensing laws. Any subsequent invalidation of these or analogous laws is irrelevant. Defendants are not required to anticipate future judicial rulings with respect to such existing laws; to decide otherwise would surely chill the First Amendment rights protected by the *Noerr* doctrine. *See Subscription Television, Inc. v. Southern Cal. Theatre Owners Assn.*, 576 F.2d 230, 233–34 (9th Cir. 1978). If APhA had lobbied for the enforcement of licensing laws it knew to be invalid or unenforceable, its conduct might be dismissed as sham. But there has been no showing that in pursing this litigation defendant or its co-conspirators engaged in such unethical practices or in any way abused the judicial process. Nor were plaintiffs denied meaningful access to the appropriate judicial forums; the fact that Federal litigated actively and eventually prevailed in both the state and federal courts of Iowa belies any notion that access was barred.

■ The submission of forged prescriptions in Arkansas is not attributable to APhA or any of its co-conspirators. Without addressing the "genuineness" of the action taken by the Arkansas grand jury, the evidence presented was not sufficient to link the Arkansas Board or its Chief Inspector, or any other participant in the Arkansas forgery operation, to the conspiracy. NABP's subsequent publicization of the indictment and arrests is not significant in this context. Accordingly, there can be no recovery for expenses incurred as a result of this effort.

■ The activities undertaken by and before the Iowa Board have been described in some detail. After carefully reviewing the

entire course of conduct, the Court concludes that these activities must be viewed not as individual, isolated events but rather as a persistent, substantial and coherent practice. The licensing delays, the revocation action taken following the Nebraska forged prescriptions, the effective prohibition on employing pharmacist interns, the attempted seizure of Federal's inventory, and the burdensome inspection conditions imposed were all part of a concerted effort to harass Federal, to disrupt and interfere with its pharmacy practice and to eliminate it as a competitor.

The state agency that sanctioned or initiated these anti-competitive activities had, through its membership, consistently expressed economic allegiance to APhA and opposition to mail order. The conduct of board members, as administrative officials responding to private initiatives, is subject to closer scrutiny under the *Noerr* doctrine than that of state legislators. *See California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. at 512–13, 92 S.Ct. at 612–13; *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707–08, 82 S.Ct. 1404, 1414–15, 8 L.Ed.2d 777 (1962). This conduct is also less protected where, as here, the focus of administrative decision-making shifts from general policy concerns toward particular, discretionary judgments responsive to commercial considerations. *See generally George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970); *In re Airport Car Rental Antitrust Litigation,* 474 F.Supp. 1072 (N.D.Cal.1979). Because the Iowa Board was itself a part of the illegal conspiracy its administrative processes could not be invoked or applied fairly or impartially with respect to Federal's business. Instead, these processes were abused by APhA, the state associations of Iowa and Nebraska, and by Board members themselves; as a consequence the challenged Board action is tainted as a sham. *See California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. at 513, 92 S.Ct. at 613; *Israel v. Baxter Laboratories, Inc.,* 151 U.S.App.D.C. 101, 107, 466 F.2d 272, 278

(D.C.Cir. 1972); *In re Airport Car Rental Antitrust Litigation, supra,* 474 F.Supp. at 1087, 1091–92; *United States v. Otter Tail Power Co.,* 360 F.Supp. 451 (D.Minn.1973), *aff'd,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

## VIII. *Damages*

Viewing the conduct of APhA and its co-conspirators as a whole after eliminating *Noerr*-protected conduct, it is clear that Federal's sales were inhibited and its profits accordingly affected. The task remains to determine the extent of the business injuries suffered by Federal and to address the claims of the three individual plaintiffs.

### A. *Statute of Limitations*

The four-year limitation period that governs recovery in this case, *see* 15 U.S.C. § 15b, has been tolled pursuant to 15 U.S.C. § 16(b) by *United States v. American Pharmaceutical Assn.,* No. 75–558 (E.D. Mich., filed Nov. 24, 1975). Thus the applicable statutory period runs from November 24, 1971. Because the proof shows that Federal was well aware of the antitrust implications and continuing damages resulting from APhA's widely publicized conduct, and it could have reasonably estimated the then-present amount of those damages immediately on the basis of relevant data available at the time, plaintiffs cannot recover for damages suffered prior to November 24, 1971.

Given the continuing nature of the conspiracy, however, the amount and nature of damages accruing after that date were speculative and unprovable as of November 24, 1971. The effects on Federal's sales and profits from restrictions on advertising, the Code of Ethics, and the Iowa Board's antagonistic licensing efforts endured well beyond 1971. Neither the continuing impact of some of these activities nor the threat that others might recur could be assigned an estimated value beyond mere guesswork at that time. Such damages became reasonably ascertainable only after the 1971 date, and plaintiffs can recover for them

here. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–42, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *AMF, Inc. v. General Motors Corp.*, 591 F.2d 68, 72–73 (9th Cir.), *cert. denied*, ——— U.S. ———, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 884–85 (2d Cir. 1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).

### B. *Lost Profits*

■ Federal's principal claim is for lost profits. As far as this claim is concerned, there were many factors that adversely affected the company's performance during the relevant period. It was hampered substantially by state laws and regulations, by the Massachusetts-Iowa litigation, by labor difficulties, by the spectacular growth of chains, and by the success of its rival, AARP. Except for certain activities of the Iowa Board of Pharmacy that occurred and affected Federal mainly prior to 1972, APhA cannot be held responsible for these obstacles.

On the other hand, the opposition of APhA and its co-conspirators to mail order advertising and the enforcement of APhA's Code of Ethics also had an adverse effect on Federal's sales and profits. There is no acceptable computation in the record measuring this effect with any certainty and concrete proof of damages is wholly missing. Much must therefore be left to "just and reasonable estimate," based largely on legitimate inference. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Columbia Pictures Indus., Inc. v. American Broadcasting Cos.*, 501 F.2d 894, 898 (2d Cir. 1974).

For example, with respect to the opposition to advertising the proof shows that in 1960–61, before Federal was even in business, APhA sought to prevent mail order advertising in *Life* and *Newsweek* magazines. *Life* did not agree and *Newsweek* indicated it had already decided not to publish. Subsequently, in eight instances, advertising proposals submitted by Federal to *Eagle Magazine, Grier's Almanac, Reader's Digest, New York Daily News, Alive & Well, Farm Journal, Iowa Farm Bureau Spokesman* and *The Farmer* were apparently rejected. There is no proof that direct intervention by APhA or any co-conspirator was responsible for these business decisions, although it may be inferred that the general campaign of APhA had some indirect effect upon some of these and upon other advertisers. However, Federal was soon primarily interested in advertising only in publications of organizations willing to sponsor its services and for practical purposes abandoned efforts to advertise in publications of general circulation. Moreover, many organizations had valid reasons independent of APhA's campaign for refusing to sponsor Federal.

As of 1974 there were 24 states that prohibited the advertising of actual prices for prescription drugs, 12 by statute and 12 by regulation. Although agitation by pharmacists undoubtedly encouraged such legislation, some was of long standing and in no case was it shown that these requirements were due to specific activities of APhA or any co-conspirator. In any event, absent proof of sham, these activities as indicated were protected by *Noerr*. Further, it must be noted that many other states had no such ban.

Federal was in fact able to continue to advertise even in states where such advertising was prohibited by law. However, Federal felt the need to exercise restraint in view of the concerted opposition it faced from pharmacists and state officials to its methods of doing business. Thus Federal, in consultation with its advertising agency, tended to avoid forms of advertising that would unduly emphasize its price-cutting schedule and to this extent the conspiracy must be held partially responsible.

Because APhA's opposition to advertising, discounting, and mail order was well known and its collaboration with related groups has been established, activities of the conspiracy undoubtedly had a negative effect on Federal's sales, at least in many states. But it must be kept in mind that legislation, litigation and other factors also

impaired Federal's sales and to this extent APhA for reasons already indicated cannot be held responsible in damages.

Confronted with these difficulties of proof, Federal attempted to construct a model through the testimony of a market economist. In this fashion plaintiff attempted to demonstrate what Federal's sales and profits would have been in an economic environment free from all the market intervention of which it complains. This proof was unacceptable and unconvincing. Plaintiffs' expert assumed the same market intervention was attributable to APhA nationwide, but in some states this had not occurred at all or was of limited effect. He assumed that APhA was responsible in damages for all legislation and regulatory opposition to mail order pharmacies. Similarly, he made no allowance for the Massachusetts litigation or other *Noerr*-protected activity. He failed to adjust for the 15 percent to 30 percent of Federal's sales made over-the-counter and outside the confines of this case. He projected a wholly unsupported compound growth rate derived in part from an analysis of sales by AARP which were not comparable due to special favorable conditions supporting that organization's business. He made no effort to present proof confined to the effect of overt acts during the post-November 24, 1971, period. He used for projection an unrealistic rate of return unrelated to Federal's own experience or that of other sellers of prescription drugs. Plaintiffs' expert was biased. No reliance can be placed on his computations purporting to show loss of past or future profits.

Being wholly unaided by Federal's damage proof, the Court must inquire whether the record otherwise contains sufficient proof to enable the Court to determine damage with reasonable certainty so as to make an award. Obviously the Court cannot resort to pure speculation but the decisions teach that an injured antitrust plaintiff should not be entirely frustrated in its efforts at compensation once, as here, the proof establishes both a violation of the antitrust laws and injury. *See, e. g., Bigelow v. RKO Radio Pictures, Inc., supra;* *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334 (5th Cir. 1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971).

As already indicated, Federal's lack of success was not due entirely to the unlawful conduct of APhA and its co-conspirators. Thus the question is presented as to how APhA's responsibility for Federal's sales and profit performance can be differentiated from other inhibiting factors in the marketplace for which APhA and its co-conspirators cannot be held legally responsible.

There is no comparable concern whose sales may be used as a guide. Neither the experience of the chains nor of the independents is analogous in the sense that Federal's experience, absent illegal restraint, would have corresponded to their sales progress. There is no showing that these other two classes of merchandisers depended on substantial advertising or price discounting. Their sales grew along with general growth of prescription drug sales, but at differing rates and undoubtedly due to distinct factors related to customer convenience and buying patterns. In contrast, AARP, another mail order prescription seller, grew rapidly and profitably at least partly because it sold only to members of a large association of retired persons with which it was closely affiliated. This rapid growth was achieved even though AARP faced the same opposition from APhA and its co-conspirators. In short, it is impossible to place Federal's experience against any industry standard. The market was definitely expanding during the relevant period, but it cannot be determined what share of that market Federal would have attracted absent the illegal activities previously described.

Because Federal never operated free of illegal restraints, there is no period of unrestrained growth to be contrasted with the relevant period. The mail order prescription business found initial acceptance in the

1960's when attitudes toward drug pricing in the wake of the Kefauver investigations led the public to look for cheaper alternative sources of supply. These conditions had changed substantially by 1972 and there is no basis for assuming that early gains would have held. Public attitudes shifted and the effect of the conspiracy perceptibly weakened. By the present, the effects of the conspiracy have largely dissipated in the wake of unrelated lawful developments within the industry, and those companies still in the mail order prescription business realize that future prospects have dimmed. The business has been unattractive for some years, given new pricing and merchandising practices and altered public attitudes.

In spite of these factors, which militate against a recovery anywhere near the figure demanded by plaintiffs, the Court is satisfied that Federal lost profits during the relevant period due to defendant's illegal activities. Federal's sales and expenses are summarized by schedules in evidence showing its actual results, year-by-year, based on certified financial statements. These, plus the overall experience of the prescription drug industry and the limited proof of the actual effects of the conspirators' illegal activities, must be weighed to arrive at an informed approximation of Federal's recoverable loss. It therefore becomes necessary to make a reasonable estimate based on relevant data.

From 1972 through 1977, the six-year damage period under review, dollar sales by independents steadily grew from approximately eight and one-half billion dollars to approximately eleven billion dollars, an increase of about 30 percent. Chains and the captive mail order business of AARP grew in the same period at even faster rates. The dollar volume of sales for the chains during the relevant six-year period increased by more than 80 percent to an annual total of almost twelve billion dollars. Federal's largest sales were in 1971. Thereafter its sales steadily declined each year from $1,619,094 in 1972 to $1,138,455 in 1977. During this period Federal's operations at best earned only a marginal profit

and the concern actually showed a loss in the two last years.

In order to determine Federal's lost profits attributable to the conspiracy in the period, it is necessary to estimate what its sales might have been had the conspiracy not been in effect. Although Federal argues for an explosive growth rate, equal to or beyond that of the chains, in fact Federal's sales were virtually static for the eleven-year audited period through 1977. Moreover, as previously discussed, many important obstacles to Federal's growth cannot be attributed to the conspiracy. Balancing all the factors in the case, and allowing for the continuing effects of events attributed to the conspiracy in earlier years, the Court has determined that Federal's sales during the six-year period would at best have cumulatively amounted to an additional $2,800,000 had the conspiracy not been in effect, or roughly one-third more each year.

It must then be determined what profits Federal was likely to have earned on this additional business. The company's records over the entire period from 1964–77 conclusively demonstrate that there was never any definite correlation between profits and sales volume. Thus in 1966 it had net income of $38,464, while on an almost identical volume it showed a loss of $62,014 in 1977. Its percentage of net income to sales varied markedly each year, never surpassing 3.30 percent; the record contains no explanation for the variations shown.

It is therefore also necessary to estimate the appropriate percentage of net income to sales, i. e., profits, which it is reasonably likely that the company would have earned on the additional business. Allowing for the fact that Federal's expenses were inordinately high in the 1970's, due in part to labor difficulties and substantial litigation expense, and reviewing the company's experience for the entire period that data are available, it appears reasonable to assume that Federal would have earned one percent on sales in the period 1972–77. Although one percent is a low rate of profit for the

retail drug industry, it exceeds the rate actually earned by Federal for any of the relevant six years. Applying this percentage, Federal's profits would have been increased and its losses reduced in this period by $28,000. There is not sufficient information available in the record to support a more precise year-by-year calculation and no effort is made to develop profits on a cumulative basis. The estimates of business lost and profits to be gained are generous to allow in part at least for this factor.

█ No basis exists for finding any loss of future profits. Mail order prescription sales have flattened out. There is no proof that Federal's business will be more than marginally profitable in the future. Its emphasis upon developing third-party payment plans has not been successful and its general method of doing business is less attractive than in the past due to the chains and other factors. The chain drug store segment of the prescription sales business is the most rapidly growing segment of the retail prescription drug market. Chain drug stores can offer the convenience of one-stop shopping by combining a pharmacy operation with a larger retail establishment. Chains have become accessible to more and more customers as a result of shopping centers. Although the illegality of APhA's opposition to advertising has been apparent in recent years and its efforts to block mail order pharmacies have changed and lessened, no corresponding growth has occurred at Federal. Its losses have appeared and grown. A claim based on loss of future profit is completely speculative.

█ The claim that Federal was required to incur extra, precautionary expense to avoid filling forged prescriptions attributable to the conspiracy was supported by persuasive proof only as to the Iowa Board's revocation proceeding. Even here, it must be noted that mail order concerns are particularly vulnerable to forgery attempts and sound business practice requires them to take special precautions. Such forgeries generally did not originate with the conspiracy. Moreover, the extra expense of checking for forgeries following the 1965 revocation proceeding had largely dissipated by 1971. Federal is entitled to $6,000 for such additional "checking" costs over the relevant six-year period.

Some of Federal's other claims for damage lack sufficient specificity and are speculative. It is claimed without concrete proof that members of Federal's management were diverted by court and administrative appearances and time spent preparing exhibits. Even ignoring problems of proof, to the extent these activities were attributable to the conspiracy and outside the protection of *Noerr* they are compensated by the award of lost profits. Finally, it is claimed that $112,849 was expended defending actions and opposing legislation. The bulk of this relates to the Massachusetts suit and cannot be recovered. There is no demonstration of other expenses in the relevant period directly attributable to non-protected conspiracy activity.

### C. *Individual Damage Claims*

█ Plaintiffs Sandahl, Johann and Rasmusen, the owners of Federal, each claim $75,000 individually, for damages incurred over a 15-year period. Sandahl says that he was injured in his individual business and property by reason of the defendant's activities in the amount of $5,000 per year, or $75,000 for the entire period from 1963–1977. The only evidence in the record relating to this claim is sketchy. He claimed that he was required to make trips (at Federal's expense) and to take time away from Federal's management (for which time he was compensated by Federal). He also testified that his personal line of credit had been subjected to greater scrutiny by lenders and that a greater percentage of collateral had been required on loans to him or to Federal which he co-signed. He also claimed that he had twice been refused a loan, once for another of his enterprises (Federal Vitamin Service) and once for a loan to him personally. None of these matters was adequately particularized. There was no proof that he was unable to obtain loans from other banks, or that his inability to obtain financing on

these two occasions had any impact whatsoever upon his personal business or property. Undoubtedly his association with a business that was receiving criticism from authorities in many states because it failed to comply with state laws and regulations hurt him but, in large part, these are the hazards of doing business in a highly regulated industry and cannot be legally attributed to APhA in this case.

Johann claimed that, because of the alleged conspiracy, he had to spend time preparing materials in connection with various legal proceedings. He was fully compensated by Federal for this time and therefore suffered no injury to his business or property as a consequence. He also claimed as injury the reduction in the value of his stock ownership interest in Federal that allegedly resulted from the challenged conspiracy. There is no evidence from which the finder of fact could make a just and reasonable estimate of the amount of the claimed reduction in value, if any. There was no claim that he had been injured in his business or property in any other way.

Johann also seeks compensation for injury to his name and reputation. In this regard, the only evidence of record is that his connection with Federal had been the subject of unspecified newspaper reports and comments.

The only evidence offered in support of Rasmusen's claim had nothing to do with his personal business or property. Instead, it involved claims that, as a result of his two arrests and the attendant publicity received, he had a problem with his children, and he had to change his family's social life to avoid social contact with pharmacists. These arrests are not attributable to the conspiracy. Moreover, this type of injury to a person's private affairs, unrelated to business considerations, is not recoverable under the antitrust laws. *See generally, Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977); *Chattanooga Foundry and Pipe Works v. City of Atlanta,* 203 U.S. 390, 398–99, 27 S.Ct. 65, 66–67, 51 L.Ed. 241 (1906).

No cognizable damages were proven by any of the individual plaintiffs.

All damages awarded must be trebled according to statute. Accordingly, Federal is awarded $102,000, plus reasonable costs and attorney's fees. A form of judgment is attached.