**FEDERAL PRESCRIPTION SERVICE, INC., et al.**

v.

**AMERICAN PHARMACEUTICAL ASSOCIATION, Appellant, William S. Apple, et al.**

**FEDERAL PRESCRIPTION SERVICE, INC., et al., Appellants,**

v.

**AMERICAN PHARMACEUTICAL ASSOCIATION, et al.**

**Nos. 80–1359, 80–1368.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1981.

Decided Aug. 12, 1981.

Certiorari Denied Jan. 25, 1981.

See 102 S.Ct. 1293.

254

Michael H. McConihe, Washington, D. C., with whom Paul L. O'Brien, Arthur D. McKey, Joel E. Hoffman and C. Coleman Bird, Washington, D. C., were on the brief, for American Pharmaceutical Association appellant in No. 80–1359 and cross/appellee in No. 80–1368.

George S. Leonard, Washington, D. C., for Federal Prescription Service, Inc., et al., appellees in No. 80–1368 and cross/appellants in No. 80–1359.

Richard M. Rindler and Gilbert E. Geldon, Washington, D. C., entered appearances for appellees National Association of Retail Druggists in No. 80–1368.

Before MacKINNON and EDWARDS, Circuit Judges and DAVIES *, United States Senior District Judge for the District of Fargo, North Dakota.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Federal Prescription Service, Inc. ("Federal") and its three owners brought an antitrust damage suit against the American Pharmaceutical Association, Inc. ("American") and certain other defendants. The other defendants have since been either dismissed or dropped as defendants and then named as co-conspirators. The district court found that American, the sole remaining defendant, had committed several violations of section one of the Sherman Act, 15 U.S.C. § 1, including participation in an unlawful conspiracy with the Iowa Board of Pharmacy Examiners to harm Federal through a series of governmental actions aimed at Federal's mail order pharmacy practice in Iowa. The court found that these and other unlawful actions damaged Federal to the extent of $28,000 in past lost profits and $6000 in costs to check for forgeries attributable to American's conspiracy against mail order pharmacy. The district court declined, however, to award any damages for future loss of profits or for losses incurred by the individual owners of Federal. American appeals from the ruling of liability, Federal appeals from the dismissal of a co-defendant and from the limitations on damages. We reverse the award of damages, holding that the facts of this case reflect no actionable conspiracy under the antitrust laws. We thus do not reach the question whether the amount of damages was properly computed.

## I. BACKGROUND

The district court's opinion, 484 F.Supp. 1195 (D.D.C.1980), details the facts and we recite only those that are relevant to the disposition on appeal. The plaintiff, Federal, was organized in 1963 and operates out of the small town of Madrid, Iowa. It is licensed to dispense prescription drugs by the Iowa Board of Pharmacy Examiners, an

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

agency of the State of Iowa.[1] Federal specializes in mail order pharmacy: it solicits the business of persons throughout the United States, who mail their prescriptions to Federal and receive their drugs by return mail.

The American Pharmaceutical Association is the national professional society of pharmacists in the United States. Its 60,-000 members include practicing pharmacists, scientists, educators, and government-employed pharmacists. The court found that about one-third of all practicing pharmacists in the United States are members of American.

The district court found that to maintain a sufficient volume of prescriptions a mail order pharmacy must advertise discounted prices on at least some of its items. These prices naturally tend to divert customers from the more traditional local pharmacies, which fill prescriptions for a walk-in local clientele. The reliance of mail order pharmacy on advertising and its competitive threat to the more traditional pharmacies was well known to the sole defendant in this case.

### A.  *American's Anti-Mail Order Pharmacy Campaign*

Since 1960 American has campaigned against the distribution of prescription drugs by mail. The district court found that

1. Federal and state laws provide that certain drugs may be dispensed only upon presentation of a prescription. Valid prescriptions are issued primarily by physicians and also by veterinarians and dentists. Prescriptions are filled by licensed pharmacists.

2. These laws were urged by American and enacted by state governments against the background of Supreme Court precedent that authorized the placement of broad anticompetitive restraints on the learned professions. *See, e. g., Head v. New Mexico Bd.,* 374 U.S. 424, 432 n.12, 83 S.Ct. 1759, 1764, 10 L.Ed.2d 983 (1963) (rejecting constitutional challenge to state prohibition on eyeglass frame price advertising by optometrists); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489–90, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (also rejecting challenge to prohibition on eyeglass advertising by price) ("We see no constitutional reason why a State

[a]lthough this opposition was usually couched in terms of a concern that mail order pharmacies undermined the pharmacist-patient-physician relationship and thus threatened patient safety or public health, in fact [American] throughout was motivated primarily by its concerns for the economic well-being of its members. The validity of the health concerns, repeatedly expressed, was never satisfactorily supported at trial.

484 F.Supp. at 1200. In general terms, American sought to persuade governmental agencies, other trade groups, and national magazines that mail order dispensing of prescription drugs is harmful to the public health. This message was presented in correspondence, at meetings, in speeches, and in American's *Journal* and newsletter, which were distributed to its members and to others in the pharmacy profession.

One early success came in 1960, when American, acting jointly with the National Association of Retail Druggists, persuaded the American Medical Association to adopt a resolution calling upon physicians to discourage use of mail order prescription services, except in rural areas. American's message was also partially responsible, the district court found, for the passage of 16 state laws forbidding mail order practice, and 30–35 state laws or regulations that hampered mail order pharmacy by prohibiting the advertising of prescription drugs.[2]

may not treat all who deal with the human eye as members of a profession who should use no merchandising methods for obtaining customers."); *Semler v. Dental Examiners,* 294 U.S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086 (1935) (rejecting constitutional challenge to prohibition on price advertising by dentists) ("We do not doubt the power of the State to . . . put a stop to . . . practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous.")

It was not until 1976, when the Supreme Court conferred on commercial advertising the protection of the First Amendment, that the presumptive unconstitutionality of advertising bans became apparent. *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (statute declaring it unprofessional conduct for

In addition, in 1962, American reported that 16 state boards of pharmacy had responded to its message by issuing cease-and-desist orders against mail order houses.

Playing an important role in American's anti-mail order pharmacy campaign was its Code of Ethics. Either expressly or by the interpretation of American's Judicial Board, the Code aimed to limit participation in mail order pharmacy by establishing two prohibitions: no member pharmacist could participate in any service eliminating the pharmacist-patient-prescriber relationship; and no member pharmacist could "solicit professional practice by means of advertising." The effect of these prohibitions was strengthened by a further prohibition that no member pharmacist could continue his employment in a pharmacy that did not comply with the other requirements of the Code. *Id.* 1201.[3] In 1975, faced with a Justice Department antitrust suit, American dropped its advertising ban in favor of a new provision stating that pharmacists "should strive to provide information to patients regarding professional services truthfully, accurately, and fully and should avoid misleading patients regarding the nature, cost, or value of the pharmacist's professional services." *Id.* The court found that the other bans, however, remained in effect.

Also instrumental in American's anti-mail order pharmacy campaign was its chief executive officer, William S. Apple. The district court found that Apple was a co-conspirator of American, on the basis that he had

> traveled throughout the country to make speeches on behalf of [American,] and wrote numerous articles in which he constantly attacked mail order pharmacies and emphasized the need to uphold the Code of Ethics and rulings of the Judicial Board. Mail order prescription was pictured as a "scheme" that threatened to destroy community pharmacy service.

Pharmacists were told they were fighting for economic survival and the opportunity to earn a living. Price-cutting was said to be a gimmick for conning the public. Advertising was described as professionally improper. Pharmacists were urged to alert physicians and regulatory officials as well as other pharmacists to the danger perceived. In this fashion, with the aid of [American's] publications, Apple largely succeeded in uniting the profession to a concerted opposition to mail order pharmacies.

*Id.* at 1204.

The district court found that Apple and American had enlisted several other organizations in a conspiracy to inhibit mail order competition for the benefit of American's pharmacist members. Among those labelled as co-conspirators was the National Association of Boards of Pharmacy. The membership of this group—a private organization—includes the members of the licensing boards which in each state regulate pharmaceutical practice. The National Association participated in the conspiracy, the court found, by adopting American resolutions that opposed mail order drug distribution and drug advertising and by sending copies of these to all of its members. The National Association also cooperated in setting up the 1960 conference "to determine what steps should be taken to oppose mail order drug distribution." *Id.* at 1203. At that meeting "all state boards [of pharmacy] were asked to use every legal method to oppose the establishment of mail order houses." *Id.*

The court found that the American College of Apothecaries was also a co-conspirator. Made up of pharmacy owners, this group was a national organization affiliated with American that "joined with American in opposing the distribution of prescription drugs by mail." 484 F.Supp. at 1203.

---

a licensed pharmacist to advertise prices for prescription drugs is unconstitutional).

**3.** It was not until 1975 that the Supreme Court decided "the practice of a learned profession falls within § 1 of the Sherman Act." *Goldfarb*

*v. Virginia State Bar,* 421 U.S. 773, 786 n.15, 95 S.Ct. 2004, 2012 n.15, 44 L.Ed.2d 572 (1975) (minimum-fee schedule published by county bar association and enforced by state bar violates Sherman Act § 1).

Also found to be a co-conspirator was each state pharmaceutical association that had been recognized by American. Each of these associations has the right to select two voting delegates to American's House of Delegates, its policy-making body. The chief administrative officers of all state pharmaceutical associations form the National Conference of State Pharmaceutical Association Executives. In its annual conference in 1960, this group and American co-sponsored a conference that resolved to oppose mail order pharmacies. In addition, 17 state associations had entered into reciprocal membership agreements with American whereby applicants for state association membership had to abide by American's Code of Ethics.

One of these state organizations affiliated with American was the Iowa Pharmaceutical Association. One thousand of its 1600 members were also members of American,[4] and, like several of the other state organizations, it adopted American's Code of Ethics as its own. It circulated opinions of American's Judicial Board to all of its members and submitted questions to the Board for further interpretations of the Code of Ethics. It established a Grievance Committee to enforce compliance with the Code and called on the Missouri Board of Pharmacy to take action against a Missouri mail order concern that was filling prescriptions from Iowa residents. Finally, in 1964 or 1965 the Association advised a Nebraska pharmacist who had complained of Federal's mail order practice that he should arrange to have bogus and forged prescriptions sent to Federal to see if they would be filled. When they were, the Association relayed the information to the Iowa Board of Pharmacy Examiners with a request that it take enforcement action against Federal, which it did.

The Iowa Board may be the most important of the co-conspirators found in this case. Like pharmacy boards generally, the Iowa Board is a governmental body empowered to license and regulate the practice of pharmacy. The court noted that during the time relevant to this suit the Iowa Pharmaceutical Association had the power to compile the list of persons from which the Governor would select members of the Board, and those persons were in each case members of the Iowa Association.

The Board, the court found, undertook a series of actions against Federal, several of them unlawful. The Board first denied Federal's license application, granting it only after being told by the Iowa Attorney General that state law did not prevent issuance of a pharmacy license to a mail order house. Then, in 1964, the Board delayed the grant of Federal's change of address license. The Board also imposed burdensome inspection conditions on Federal, and cooperated with pharmaceutical associations in Iowa and Nebraska in preparing forged prescriptions to be sent to Federal. In 1965, on the basis of these filled prescriptions, the Board revoked Federal's pharmacy license, but Federal succeeded in Iowa state court in having the revocation annulled. In 1968 the Board attempted to seize Federal's inventory pursuant to a search warrant, but withdrew the warrant after Federal filed suit to prevent the search and before any seizure was effected. In 1970 the Board withheld Federal's annual relicensing. In 1973 the Board induced the state to seek to have Federal enjoined from filling out-of-state prescriptions, but the action was dismissed and the Iowa Supreme Court affirmed the dismissal. Finally, in 1966, the Board denied Federal's request to be certified as a suitable employer of pharmacist interns. The reason for the denial, the court found, was that Federal did not belong to the Iowa Pharmaceutical Association.[5]

---

4. Under a "grandfather" clause, those who joined the state association prior to its affiliation with American were not required to join the national organization.

5. In explaining why Federal did not qualify to be a preceptor of pharmacist interns, the Iowa Board did not mention membership in any association. There was evidence, however, that a pharmacy that scored below 85 on the state's annual Inspection and Rating Report could not

Federal also encountered legal difficulties in Massachusetts. In 1967 the Massachusetts Pharmaceutical Association secured a state court judgment that Federal's mail order activities in Massachusetts constituted the unlicensed practice of pharmacy in that state. Federal did not appear in the Massachusetts proceedings to present its defense. The Massachusetts Association then asked that American finance a suit to enforce the Massachusetts judgment in Iowa under the Full Faith and Credit Clause. American agreed, and paid for two actions, one federal and one state, neither of which resulted in an enforcement of the Massachusetts judgment. The National Association of Boards of Pharmacy approved of this action, noting in its minutes that its staff was to support the Iowa suits, even though, the court found, the National Association "knew at the time that the Massachusetts suit ... had been instituted primarily for the purpose of eliminating Federal's price competition with the Massachusetts Association members." 484 F.Supp. at 1206.

### B. *Decision of the District Court*

The district court concluded that there had been a "group boycott" among American, Apple, the National Association of Boards of Pharmacy, the American College of Apothecaries, each state pharmaceutical association, and the Iowa Board of Pharmacy Examiners. The court found that the boycott was designed to impede the access of Federal and other mail order pharmacies to prescription drug customers, and amounted to a per se violation of section 1 of the Sherman Act. The court cited as elements of this unlawful group boycott the pre-1975 ban on advertising, the opposition to discounting, and the applications of the Code of Ethics that affected non-members as well as members of American.

Some of the activities of American and its co-conspirators, however, were found to

be beyond the coverage of the Sherman Act as interpreted by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The *Noerr* doctrine, holding immune from antitrust liability those activities genuinely intended to influence governmental policy, was held to protect the conspirators' participation in the Massachusetts-Iowa litigation and, for the most part, their lobbying of state boards. The court also dismissed as a defendant the National Association of Retail Druggists, on the ground that its actions in concert with American were simply "joint attempts to enlist other organizations with allied interests to rally in a common publicity effort" and, as such, protected by *Noerr. Federal Prescription Service v. American Pharmaceutical Ass'n*, 471 F.Supp. 126, 130 (D.D.C.1979).

The series of actions taken against Federal by the Iowa Board, on the other hand, convinced the district court that the Board's administrative processes were being abused by a conspiracy among American, the Iowa and Nebraska state pharmaceutical associations, and the Board members themselves. For the Board's actions, then, American was held liable.

The court then turned to an assessment of damages. "Viewing the conduct of [American] and its co-conspirators as a whole after eliminating *Noerr*-protected conduct," the court thought it "clear that Federal's sales were inhibited and its profits accordingly affected," 484 F.Supp. at 1209, although the statute of limitations prevented recovery for damages suffered prior to November 1971. The court attributed some of Federal's lost sales and profits to "the opposition of [American] and its co-conspirators to mail order advertising and the enforcement of [American's] Code of Ethics." *Id.* at 1210. Specifically, the court inferred that American's general campaign had

---

be a preceptor, that the Report's forms deducted 10–15 points if the pharmacy belonged to neither the Iowa Association nor the American Pharmaceutical Association, and that Federal's scores were within 10 of the required 85. Tr.

86; Plaintiff's Exhibits 48–50. It thus appears that Federal's nonmembership was a dispositive reason for its rejection as a preceptor. We understand that to be the basis of the district court's finding.

some indirect effect on national magazines that rejected advertising proposals submitted by Federal. *Id.* In addition, the conspiracy was to be "held partially responsible" for the restraint that Federal felt it had to exercise in advertising discount prices. The activities of the conspiracy "undoubtedly had a negative effect on Federal's sales" because American, in collaboration with its co-conspirators, had made its "opposition to advertising, discounting, and mail order . . . well known." *Id.* At the same time, the court recognized that Federal's sales were also impaired by legislation and litigation, neither of them actionable in this case given the immunity within *Noerr*, and by other factors, such as labor difficulties, that could not be attributed to the conspiracy.

Having found that actionable elements of the conspiracy had had some adverse effect on Federal's sales and profits, the court then determined, through a reasoning process not relevant to our disposition of this appeal, that the amount of Federal's actionable damages amounted to $28,000 in lost profits. 484 F.Supp. 1210–13. The court also determined that the forged prescription scheme resulting in the revocation of Federal's pharmacy license by the Iowa Board had required Federal "to incur extra, precautionary expense to avoid filling forged prescriptions attributable to the conspiracy" in the amount of $6000. *Id.* at 1213. Requests for further awards of damages were denied, leaving Federal with a trebled damage award of $102,000.

## II. DISCUSSION

### A. *Issues of Liability in Light of the Noerr Doctrine*

Many of the issues on appeal involve the district court's applications of the *Noerr* doctrine. The district court held several of the joint anticompetitive activities attributable to American to be protected by *Noerr*, while holding others to fall within *Noerr's* "sham exception." Virtually every application of *Noerr* in this case is challenged on appeal by either Federal or American. A preliminary review of *Noerr* and related cases will place the parties' contentions in the proper light.

### 1. The *Noerr* Doctrine

In *Noerr*, trucking companies alleged that railroads, through a public relations firm, had violated section one of the Sherman Act by conducting a malicious and fraudulent campaign to gain passage and enforcement of laws that would harm the trucking industry in the long-haul freight market. Relying on legislative history and a desire to avoid any question of an unconstitutional infringement upon the First Amendment right to petition, the Supreme Court held unanimously that the Sherman Act was not intended to proscribe joint action "to persuade the legislative or executive to take particular action with respect to a law that would produce a restraint or monopoly." 365 U.S. at 136, 81 S.Ct. at 528.

> A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would . . . deprive the government of a valuable source of information and, at the same time, deprive people of their right to petition in the very instances in which that right may be of the most importance to them.

*Id.* at 139, 81 S.Ct. at 530. The Sherman Act was thus read to regulate only "business activity," not "political activity." *Id.* at 137, 81 S.Ct. at 529. Even the direct infliction of harm on a competitor is not subject to the Sherman Act, the Court held, so long as it is the incidental effect of a publicity campaign to influence governmental action. *Id.* at 143, 81 S.Ct. at 532.

The Court also noted, however, that "a publicity campaign, ostensibly directed toward influencing governmental action, [may be] a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 144, 81 S.Ct. at 533. In order for the public relations activity to be immune from antitrust, then, the Court stated that it must be "a genuine effort to influence legislative and law enforcement practice." *Id.*

Subsequently, in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court reiterated the holding that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593. The *Pennington* Court held that certain large coal operators and the United Mine Workers were not liable under the antitrust laws for jointly persuading the Secretary of Labor to set a minimum wage for employees of coal suppliers selling coal to the Tennessee Valley Authority, *id.* at 660, 670, 85 S.Ct. at 1588, 1593, even though this action was intended to drive smaller coal operators out of the market.

The Court elaborated upon *Noerr's* "sham exception" in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The allegation in *Trucking Unlimited* was that the trucking company defendants jointly carried out a plan to oppose in regulatory governmental agencies and reviewing courts all of the applications for operating rights that were filed by carriers seeking to compete with the defendants. While holding that exercising access to the agencies and courts to oppose the grant of operating rights is protected by the First Amendment's right of petition, the Court cautioned that such exercise is not necessarily immune from antitrust scrutiny:

> a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn the case is established that abuse of those processes produced an illegal result, *viz.*, effectively barring [plaintiffs] from access to the agencies and courts. Insofar as the administrative or judicial processes are in-

volved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression." 404 U.S. at 513, 92 S.Ct. at 613.

2. *Noerr*-based Claims of Federal

We deal first with Federal's claims that the district court erred in holding that *Noerr* protected (1) the lobbying of state boards of pharmacy to promulgate and enforce. regulations inhibiting mail order pharmacy; (2) the litigation brought against Federal by the Massachusetts Pharmaceutical Association and pursued in Iowa with the help of American, the National Association, and the Iowa Association.[6]

■ The lobbying by American and the National Association of Boards of Pharmacy that was directed at the state boards of pharmacy is securely within the protection of *Noerr*. The state boards are governmental agencies empowered to regulate the practice of pharmacy. The lobbying by American and the National Association was a genuine attempt to secure governmental action.

■ Federal argues, however, that the activities of these organizations fall within *Noerr's* sham exception. Federal maintains that "the difference between protected activity and sham action depends on the competitive or anti-competitive purpose of exercising the right of petition and . . . evidence of such a purpose is a pattern of actions designed to accomplish the destruction of a competitor." Appellee's brief at 31. That, plainly, is not the law. Anticompetitive intent alone is not enough. Nor is it sufficient that the persons engaged in lobbying activity also engaged in "a pattern of actions." Both factors were present in *Noerr*, in which the Court held the complained of activities were beyond the scope of the antitrust laws. What is needed in addition is proof that the lobbyists subverted the integrity of the governmental process, that they effectively barred Federal's

---

**6.** Federal does not elaborate upon its objection to the dismissal of the National Association of Retail Druggists, and we affirm, generally for the reasons stated in the district court's separate opinion on this issue, 471 F.Supp. 126–30, and because Federal has not proved that the actions of the Retail Druggists have caused it injury in fact.

access to these processes, or that the nature of these processes made their invocation something other than the "political activity" that was recognized by the *Noerr-Pennington-Trucking Unlimited* line of cases to be beyond the scope of the Sherman Act.

The cases Federal cites in support of its peculiar view of the sham exception are easily distinguishable. In one set of cases, the integrity of the regulatory process was at stake. Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*.[7] Here, in contrast, there is no showing that American and the National Association engaged in any but legitimate political attempts to secure governmental action. In another set of cases, *Noerr* was held inapplicable because the defendants'

actions were intended not to secure governmental action but to harm the plaintiff by abusing the relevant governmental process.[8] These cases are likewise inapposite, for there is no evidence that American effectively barred Federal's access to governmental bodies, that any of American's adjudicatory actions were "baseless," or that American otherwise abused governmental processes by seeking an anticompetitive goal collateral to the result ostensibly sought in the proceeding.[9]

In a third set of cases, upon which Federal chiefly relies, the defendant's activity is viewed in light of the nature of the governmental agency. Private efforts to influence governmental bodies acting in an economic rather than a political framework, e. g., a governmental procurement agency, have been held unprotected by *Noerr* because these efforts, in *Noerr's* terms, constitute "business activity" rather than "political activity."[10] Here, by contrast, *Noerr* is

7. *Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272, 274, 275–79 (D.C. Cir. 1972) (seeking to undermine fair and impartial functioning of administrative agency by misrepresentation and suppression of information); *Sacramento Coca-Cola Bottling Co. v. Teamsters Local 150*, 440 F.2d 1096, 1099 (9th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971) (using threats and other coercive measures to influence state fair officials); *Wood Exploration & Prod. Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1298 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (filing false nomination forecasts with state commission to reduce production allowables of other producers); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 29 (1st Cir. 1970), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970) ("fraudulent statements and threats" to gain advantage over competitor seeking same government contract).

8. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) (abuse of processes "effectively barring . . . access to the agencies and courts"); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 379 n.9, 93 S.Ct. 1022, 1030 n.9, 35 L.Ed.2d 359 (1973) (power company, while filing repetitive suits to prevent sale of bonds needed by competing city power systems, offered towns inducements to grant the power company a new franchise).

9. It has been suggested that courts interpreting the limits of *Noerr's* sham exception should

rely on the common law torts of malicious prosecution and abuse of process. *E. g.*, Note, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies: Analogies to Malicious Prosecution and Abuse of Process*, 86 Harv.L.Rev. 715 (1973). Resort to a malicious prosecution analogy is unavailing for Federal here, since there was no showing that any of the various proceedings American helped to institute against Federal were "clearly unreasonable." See *id.* at 728–29. Moreover, to succeed in an action for malicious prosecution the plaintiff must show that the earlier action against it failed. Yet the proceedings of which Federal complains most vigorously are those that resulted in governmental action adverse to it. Nor can Federal rely upon analogies to the tort of abuse of process. Although that tort lies even for meritorious litigation, it lies only if the purpose of the defendant's litigation is collateral to and *not the subject of his complaint*. *Id.* at 732. Here, American's avowed purpose in all relevant governmental proceedings was to stifle drug advertising or mail order pharmacy. Its anticompetitive purpose was not collateral to its invocation of governmental process but rather was inherent in it.

10. See, e. g., *Hecht v. Pro Football, Inc.*, 444 F.2d 931, 940–42 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (football team bargaining for a restrictive covenant in lease with government-owned football stadium not immune from antitrust

fully applicable, for the boards of pharmacy are charged with making regulatory decisions rather than commercial decisions.

Federal, however, disputes that the pharmacy boards are true regulatory agencies. It emphasizes that many boards consist mostly if not wholly of community pharmacists who as a class compete with mail order pharmacy in the prescription drug market. Federal contends that these boards in inhibiting mail order pharmacy necessarily act in their commercial self-interest, and that the antitrust laws require licensing authorities to be free of commercial bias. Our own view of the antitrust laws is not so expansive. However desirable might be the goal of ridding government of the appearance of catering to special interests, the Sherman Act was not designed to achieve it. The composition of a state board of pharmacy is determined by state law, and is a matter to be corrected, if correction be needed, through the political process, not by application of the Sherman Act. To hold otherwise would be to ignore the plain fact that the Act was not meant to regulate political activity. *E. g., Parker v. Brown,*

317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Federal's final "sham" argument is that the district court should have found that each state board of pharmacy that imposed mail order restrictions was a participant in American's conspiracy. Given this finding, Federal contends, the efforts of American and its co-conspirators to have state boards enforce laws against the mail order houses would be unprotected by *Noerr* on the ground that *Noerr's* protection does not apply where the governmental agency is a co-conspirator of those trying to influence it.[11] Federal's contention builds upon the district court's findings that the National Association of Boards of Pharmacy and each state pharmaceutical association were co-conspirators of American. Federal relies first on the relationship between each state board and the National Association—state board members automatically become members of the National Association and the active members of each state board select a

suit by virtue of *Noerr* ); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra* note 7, 424 F.2d at 33 (*Noerr* does not protect efforts to influence "public officials engaged in purely commercial dealings" and charged with the task of making "government purchases . . . according to strictly economic criteria."); *In re Airport Car Rental Litigation,* 474 F.Supp. 1072, 1091 (N.D.Cal.1979) (those seeking to influence airport authorities in charge of licensing car rental operations were not entitled to antitrust immunity under *Noerr* because the authorities were "acting as a commercial entity influenced by economic concerns rather than as a policymaking unit of government."); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707–08, 82 S.Ct. 1404, 1414–1415, 8 L.Ed.2d 777 (1962) (companies who influenced a private corporation acting as Canada's purchasing agent to exclude plaintiff from the relevant market were not immune under *Noerr* because they were "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.")

11. *See, e. g., California Motor Transp. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) ("Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression."; *Continental Ore Co. v. Union Carbide & Carbon*

*Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962) (no *Parker v. Brown* immunity for companies given exclusive selling rights by private company exercising authority power as nation's purchasing agent and alleged to be a co-conspirator); *United Mine Workers v. Pennington,* 365 U.S. 657, 671, 85 S.Ct. 1585, 1594, 14 L.Ed.2d 626 (1965) (no antitrust damages for "the act of a public official who is not claimed to be a co-conspirator; *Parker v. Brown,* 317 U.S. 341, 351–52, 63 S.Ct. 307, 313–314, 87 L.Ed. 315 (1943) ("We have no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade."). *But see Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 230 (7th Cir. 1975) (criticizing the public co-conspirator doctrine); Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the* Noerr-Pennington *Doctrine,* 45 U.Chi.L. Rev. 80, 115 (1977) ("in most cases the co-conspirator exception is unworkable and should not be recognized").

It seems doubtful that the existence of a public co-conspirator would explain any result more satisfactorily than one of the more established exceptions to the *Noerr* doctrine, see notes 7–10 *supra.*

delegate who, with other state delegates, determine the policies of the National Association. One of those policies, as noted above, was to ask "all state boards ... to use every legal method to oppose the establishment of mail order houses." Federal also relies on the relationship between many state boards and the corresponding state pharmaceutical associations—in at least 14 states the board members, as required by state law, are selected from the membership of the state pharmaceutical association; in many other states (such as Iowa) the law has provided that the board members be selected from a list compiled by the state association. It is the delegates of the state associations, Federal emphasizes, who have a dominant voice in determining the policy of the American Pharmaceutical Association. Finally, Federal relies on American's boast that 16 state boards have responded to its request that cease-and-desist orders be issued against mail order pharmacies.

We hold as a matter of law that introduction of this evidence did not meet Federal's burden of showing that state board members participated in a conspiracy with the defendant. First, as to American's communications to the state boards, we decline to assign probative value to the fact that some state boards responded favorably. *Noerr* holds the antitrust laws are not intended to regulate genuine efforts to secure governmental action. That American's efforts were genuine is manifested by their success. It would make a nullity of *Noerr* to hold a state board to be a co-conspirator, and the petitioning activity directed at it thus unprotected, on the basis that the petitioning was successful. That a public official is persuaded by the entreaty of a lobbyist does not make him the lobbyist's co-conspirator.

For a similar reason we hold that evidence of overlapping membership in a case such as this is not to be treated as probative of conspiracy. Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations, much less in a conspiracy between those associations and yet another association. *E. g., Phelps Dodge Refining Corp. v. FTC*, 139 F.2d 393, 396–97 (2d Cir. 1943).

Federal contends that more than mere membership is involved, however, and relies on a "membership ratification" theory to argue that American is responsible for the actions of the state boards. That reliance is misplaced. As articulated in *Phelps*, a leading case on membership ratification,

> the issue is reduced to whether a member who knows or should know that his association is engaged in an unlawful enterprise and continues his membership without protest may be charged with complicity as a confederate. We believe he may. Granted that his mere membership does not authorize unlawful conduct by the association, once he is chargeable with knowledge that his fellows are acting unlawfully his failure to disassociate himself from them is a ratification of what they are doing. He becomes one of the principals in the enterprise and cannot disclaim joint responsibility for the illegal uses to which the association is put.

*Id.* Under the membership ratification theory, liability is imposed upon members of an association who knowingly acquiesce in its unlawful conduct.[12] Applied here, this theory would, at most, make individual members of some state boards liable for the conduct of the National Association of Boards of Pharmacy or the relevant state pharmaceutical association. We are not aware of a case in which the theory was held to work backwards, and make the association liable for the conduct of individual members. For that to happen it must be shown that the members were acting with apparent authority conferred upon them by

---

**12.** For further discussion of the membership ratification doctrine, see *Kline v. Coldwell, Bankers & Co.*, 508 F.2d 226, 231–33 (9th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

the association,[13] and we decline to treat as probative of any such authorization the use of legitimate forms of communication to influence governmental action. A different case would result were it shown that state board members were bribed by American, or met in an unlawful fashion with its officers, or were otherwise induced by American, *by means other than legitimate lobbying and publicity*, to take action against mail order houses. Evidence of this sort does not appear on the record.

■ Federal's other allegation of misapplication of *Noerr*—that the Massachusetts-Iowa litigation fits within the sham exception—has no more merit than the first. The district court found the litigation was *not* baseless or frivolous, that there was no showing of any abuse of the judicial process, and that Federal was not denied meaningful access to the appropriate judicial forums. These findings are not clearly erroneous, and again we affirm.

### 3. *Noerr*-based Claims of American

This brings us to American's contention that the district court erred in finding some of its activities unprotected by the doctrine of *Noerr*. We begin with the weightiest of American's *Noerr*-based contentions—the claim that American was not responsible in damages for the actions of the Iowa Board.

The district court's holding that American was liable for these actions appears to rest on two alternative rationales: (1) The Iowa Board's processes were abused by the private groups—American and the Iowa and Nebraska Associations. (2) The members of the Iowa Board were themselves part of the illegal conspiracy, making a fair administrative process impossible. 484 F.Supp. 1209.[14] Because either finding may be sufficient to invoke the sham exception and remove *Noerr* immunity for American, we examine each independently.

■ Just how American and its non-governmental co-conspirators abused the processes of the Board does not appear in the district court's opinion. Insofar as the record reveals, the conspirators simply requested the Iowa Board to enforce the law as they saw it. The district court's position is not aided by its statements that "[t]he conduct of board members, as administrative officials responding to private initiatives, is subject to closer scrutiny under the *Noerr* doctrine than that of state legislators," and that "[t]his conduct is also less protected where, as here, the focus of administrative decisionmaking shifts from general policy concerns toward particular, discretionary judgments responsive to commercial considerations." 484 F.Supp. at 1209. The proper focus in determining whether *Noerr* applies is not on the conduct of the governmental officials, but on the conduct of the petitioners. It is true that courts have considered the type of governmental body involved (legislative, administrative, or adjudicative) when determining whether *deliberate misrepresentations* are protected by *Noerr*, in line with the thinking that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). And the type of governmental body may shed light on whether the petitioners were engaging in "political activity." *See* note 10 *supra*. But where, as here, the activities complained of consist of traditional attempts to induce regulatory action, it ill serves the policies underlying *Noerr* to make the protection of the lobbying depend on the "administrative" or "legislative" nature of the lobbied government agency.[15]

---

13. *E.g., Hydrolevel Corp. v. American Society of Mechanical Engineers*, 635 F.2d 118, 125–27 (2d Cir. 1980).

14. This finding of the district court contrasts, of course, with the finding it made as to all of the other state boards. See 484 F.Supp. at 1204; at pages 264–265 *supra*.

15. The focus in a *Noerr* inquiry is on the conduct of the petitioners because the aim of the *Noerr* doctrine is to encourage legitimate exercises of the right to petition. The distinct but related goal of encouraging public-spirited official decisionmaking is served by the doctrine of official immunity, which in varying extents protects government officers from individual liabil-

The district court's other ground for holding American responsible for the Iowa Board's actions against Federal is the finding that the Iowa Board members were themselves conspirators with American.[16] In this connection the focus properly is on the conduct of the governmental officials, to the extent it bears on their participation in a conspiracy.

With but one exception, the evidence to support the finding that the Iowa Board conspired with American is co-extensive with that supporting Federal's properly rejected contention that every state board was a co-conspirator of American. See TAN 11–13 *supra*. The sole exception is the evidence of the Iowa Board's unusually aggressive stance against mail order pharmacy—delaying, withholding, and revoking Federal's license, supporting action aimed at an injunction against Federal's out-of-state prescriptions, imposing "unusual and burdensome inspection conditions on it," and administratively denying Federal the right to employ pharmacist interns. The district court rejected the explanation that these actions were taken out of concern for the public health and safety; rather, it concluded, they "followed [American's] action proposals and were taken to further [American's] objectives, often without regard to the requirements of Iowa law." 484 F.Supp. at 1204.

■■■■ While having no occasion to quarrel with the district court's subsidiary factual findings, we consider the court was clearly erroneous in its ultimate finding that the Iowa Board members unlawfully conspired with American. Accepting as true that the board members acted in conformance with American's economic goals rather than solely in selfless dedication to the public good, we decline, given the availability of a better explanation for their conduct, to treat that parallel conduct as significant probative evidence of an unlawful conspiracy with American.[17] Although parallel behavior may support an inference of conspiracy when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self-interest, that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action. *Compare Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) *with First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).[18] The behavior of the Iowa Board in this case is not of the kind that could only make sense in the context of the behavior of others; rather, it can be persuasively explained by the exercise of rational, independent judgment. If we take as true Federal's claim that the Board was dominated by community pharmacists pursuing commercial self-interest, then the Board's action in attempting to hinder Federal's operation is explained as simply an effort to serve the economic interests of the Board members and their professional peers. If instead Federal is wrong and the Board was

ity for their official acts. It is with respect to official immunity (an issue not involved here inasmuch as no public official is a defendant) that there is a well-established distinction between "legislative" and "administrative" functions. *See e.g., Scheurer v. Rhodes*, 416 U.S. 232, 247, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974) (while immunity for judges and legislator is absolute, immunity for officers of executive branch depends in part "upon the scope of discretion and responsibilities of the office."); *accord, Butz v. Economou*, 438 U.S. 478, 508–17, 98 S.Ct. 2894, 2911–2916, 57 L.Ed.2d 895 (1978). We think it unnecessary and inappropriate to import that distinction into a *Noerr* analysis.

**16.** The court was apparently relying on a line of dicta that the antitrust laws apply in full when the governmental body sought to be influenced is a co-conspirator of those trying to influence it. For further discussion of this point, see note 11 *supra*.

**17.** *See generally United States v. Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.")

**18.** *See generally Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446–47 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *FTC v. Lukens Steel Co.*, 454 F.Supp. 1182, 1188–91 (D.D.C.1978).

actually seeking in good faith to advance the public interest, the inference that it unlawfully conspired with American is weaker yet. We thus conclude that the most convincing explanations of the Board's conduct do not support the theory that Board members were participants in an unlawful conspiracy with American.

■ American cannot be held liable, then, for damages resulting from its genuine and legitimate attempts to secure governmental action, whether through financing lawsuits, lobbying legislatures, or petitioning administrative bodies.

### B. *Issues of Damages*

■ Remaining for our consideration are several concerted activities that, like the activities of the Iowa Board, were found to be both attributable to American and hindrances to Federal's economic performance during the statutory period of recovery. American would have us rule that all of these activities are privileged under the *Noerr* doctrine, arguing that *Noerr*, with its First Amendment underpinnings, cannot be limited to exercises of the right to petition but must extend to a broad variety of expressional and associational activity as well.[19] We decline that invitation to go so boldly where few courts have gone before, for we perceive that the district court's judgment of damages should be reversed on a narrower ground: Federal has failed to show that these activities, even if unprivileged antitrust violations, have caused it injury in fact.

The district court found harm to Federal to emanate from these remaining antitrust violations: (1) a "group boycott" among American and its co-conspirators, "specifically directed at Federal" with "the intended and necessary effect of excluding or impeding Federal and other mail order pharmacies from access to retail customers"; (2) American's prohibitions on adver-

tising, (3) the concerted opposition to discounting, and (4) the restrictive applications of the Code of Ethics affecting non-members. In examining these findings we inquire in each instance whether Federal has shown that the conduct in question has caused it injury in fact.

We note at the outset the underlying statutory law: "Any person who shall be *injured* in his business or property *by reason of* anything forbidden by the antitrust law may sue . . . and shall recover threefold the damages sustained by him." 15 U.S.C. § 15 (emphasis added). To recover damages, then, the plaintiff must prove not only an antitrust violation but the causal link between the violation and an injury to his business or property. Courts have recognized "a clear distinction between the measure of proof necessary to establish the fact that [the antitrust plaintiff] ha[s] sustained some damage, and the measure of proof necessary to enable the [factfinder] to fix the amount." *Story Parchment Co. v. Paterson Paper Parchment Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). The quantum of damages "can be estimated on any reasonable basis," but first the "fact of injury" must be "certainly proved." *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334, 340 (5th Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). We need not reach the question whether the district court reasonably estimated the amount of damages, for we hold it erred in finding that Federal was definitely harmed by any actionable conduct attributable to American.

### 1. Group Boycott

A person is injured, not by a conspiracy in vacuo, but by overt acts ascribed to it. The court's finding that American and others had engaged in a group boycott against Federal apparently rested on a number of

---

**19.** American cites *Missouri v. National Org. for Women*, 620 F.2d 1301 (8th Cir.), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) (boycott of convention facilities in ostensible effort to force legislative action not actionable under the antitrust laws), and *Feminist*

*Women's Health Center v. Mohammad*, 586 F.2d 530, 545 n.12 (5th Cir. 1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979) (noting freedom of speech as well as right to petition might limit reach of antitrust laws, although this is doubtful).

specific activities, in addition to those that the court listed as separate violations of the Sherman Act.[20] One act that the court attributed to the boycott was the collusion between the Nebraska and Iowa Pharmaceutical Associations that resulted in the 1965 revocation action against Federal for the filing of a forged prescription. The court found that "[t]he claim that Federal was required to incur extra, precautionary expense to avoid filling forged prescriptions attributable to the conspiracy was supported by persuasive proof only as to the Iowa Board's revocation proceeding." 484 F.Supp. at 1213. The court acknowledged that "the extra expense of checking for forgeries following the 1965 revocation proceeding had largely dissipated by 1971," the beginning of the statutory recovery period, *id.*, but then held, without revealing the source of its estimate, that Federal was entitled to $6,000, trebled to $18,000, for its "additional 'checking costs'" over the relevant recovery period. *Id.*

The sole evidence that additional forgery-checking expenses resulted from American's conduct is the testimony of two Federal proprietors—Roland Rasmussen, its chief pharmacist, and Craig W. Sandahl, its president. Rasmussen testified that Federal checked each prescription for abuse-prone medication against a signature file which contained the number assigned to the prescriber by the Bureau of Narcotics and Dangerous Drugs (BNDD) or the Drug Enforcement Agency (DEA). In the event of a discrepancy, Federal made inquiries by telephone or mail to ensure that the prescription it received was truly authorized by a licensed prescriber. The unique feature of Federal's system, Rasmussen explained, was the maintenance of the signature file. He testified that "our problem is that so many of our forged prescriptions were com-

ing from experts, from pharmacists, and Pharmacy Board members and Pharmacy Association members, to check." Tr. 78. "If you were in a store where you did not have to be concerned about the Pharmacy Board sending a bunch of forged prescriptions," Rasmussen added, "checking wouldn't be nearly the same problem." *Id.* Sandahl similarly explained that Federal instituted extensive precautions. "Otherwise, we are going to be hauled into court time after time after time." Tr. 1334. His only specific explanation of Federal's safeguards against filling forged prescriptions was that Federal carried a segregated BNDD list, "an independent list to try and ascertain that that is, in fact, the man." Tr. 1334. "Before the BNDD came out and said you must segregate, and they gave us a list, or began to have a schedule of drugs, we had our own file." Tr. 1335. Sandahl estimated that additional safeguards had cost $125,000 over the period 1963–77.

On the basis of this evidence we think it too speculative to find that American was responsible for Federal's extraordinary forgery checking expenses, given the availability of alternative explanations for those expenses. First among these explanations is the decree in the 1965 state court order annulling the revocation of Federal's pharmacy license. Although granting Federal the principal relief it sought, the state court also ordered Federal, "[b]efore filling any mail order prescription, to peruse the same carefully to determine that it appears genuine on its face, and if it does not, to contact the prescribing physician."[21] Further, in the early 1970's, the federal government issued regulations under the Comprehensive Drug Abuse Prevention and Control Act which place responsibilities on pharmacists with respect to the requirements that prescriptions for controlled substances (1)

---

**20.** American, relying on *Smith v. Pro Football*, 593 F.2d 1173, 1178 (D.C.Cir.1978), argues with some force that the district court erred in classifying the anti-mail order pharmacy campaign as a "group boycott" constituting a per se violation of the Sherman Act. We note this contention without ruling on it, believing that the legality of American's conduct need not be de-

termined, whether under a per se or a "rule of reason" analysis, given the lack of any demonstrated injury resulting from that conduct.

**21.** *Board of Pharmacy Examiners v. Federal Prescription Service*, No. 26,762, slip op. at 9 (Iowa Boone County Ct. Nov. 10, 1965), *reprinted in* Appellee's Appendix at 222.

include certain data (the patient's name and address and the prescriber's registration number) and (2) be a bona fide prescription for a legitimate medical purpose. Tr. 1335.[22] Finally, while there was testimony that Federal took anti-forgery precautions more extensive than those taken by a traditional community pharmacy, the community pharmacy by its nature has less need for elaborate precautions. Community pharmacists have some familiarity with those who write prescriptions in their own area, and samples of prescribers' signatures are readily available in the pharmacist's files. A mail order pharmacy such as Federal, on the other hand, serves an unseen clientele over a nationwide market. It is not similarly situated and some higher degree of precaution is naturally to be expected. Sandahl acknowledged that Federal maintained a physicians' registry and checked on apparent forgeries right from the beginning of Federal's operation. Tr. 1241–42. He stated that the damages claimed for forgery checking were for "taking care of the special segregated prescription file, . . . what later was a signature file, and for taking care of the time and effort of looking up and having to phone doctors." App. 132. The evidence supports the conclusion that Federal's safeguard system antedated and proceeded independently of any forged prescription scheme that might be attributed to American. It was Federal's legal obligation and a prudent pharmaceutical practice to go to the lengths it did. It would thus take far more detailed proof than the *ipse dixit* of Federal's owners to show that there was a causal connection between American's participation in any forgery scheme and injury to Federal.[23]

Other activities performed pursuant to the alleged "group boycott" included: writing letters of protest to magazines that advertised mail order pharmacy; requesting American's members to write articles for local medical journals decrying the use of mail service pharmacies; and informing pharmacy, student, and health groups (through correspondence, publications, and speeches made by American officials) of American's opposition to mail order pharmacy and the drug price advertising on which it depended. It appears that these were among the activities the district court had in mind when it held unlawful the "concerted opposition to discounting." 484 F.Supp. 1207.

■■■■ These activities are too remote from any injury sustained by Federal to meet the "reasonably certain" test of injury in fact under the antitrust laws. Although the conduct of American and its co-conspirators was said to have the "necessary effect of excluding or impeding Federal . . . from access to retail customers," 484 F.Supp. at 1207, we find no significant probative evidence of such effect. American's campaign was an attempt to galvanize the health community into a unified political opposition to the threat of mail order pharmacy; it had no demonstrated effect in depriving Federal of either suppliers or customers. Federal has maintained that the fact of its injury is a "self-evident conclusion," but rather than citing any record support for its position has simply referred us to the district court opinion. The district court found that "Federal felt the need to exercise restraint in view of the concerted opposition it faced from pharmacists and state officials to its methods of doing business." 484 F.Supp. at 1210. It thus "tended to avoid forms of advertising that would unduly emphasize its price-cutting schedule and to this extent the conspiracy must be

---

**22.** See 36 Fed.Reg. 7799 (April 24, 1971), codified at 21 C.F.R. §§ 306.04(a), 306.05(a). The district court found that the period for which Federal could collect damages under the statute of limitations, 15 U.S.C. § 15b, commenced on November 24, 1971.

**23.** *See Shumate & Co., Inc. v. National Ass'n of Securities Dealers, Inc.*, 509 F.2d 147,. 152 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

Our conclusion that no damages in the form of extra checking costs are definitely attributable to the 1965 forgery scheme and revocation makes it unnecessary to consider whether American, which did not directly participate in the scheme, can be held liable for its consequences.

held partially responsible." *Id.* These findings do not support a conclusion of injury in fact, especially in light of the court's additional finding that "Federal was in fact able to continue to advertise even in states where such advertising was prohibited by law." *Id.* The hindrances on Federal's advertising emanated from acts of government and not to any activity of American that can be found to be actionable in light of *Noerr.*

The district court also noted that American in several instances had urged magazines to reject advertising proposals by other mail order pharmacies, and that eight magazines, for various asserted reasons, had rejected advertising proposed by Federal. The court found "no proof," however,

> that direct intervention by [American] or any co-conspirator was responsible for these business decisions, although it may be inferred that the general campaign of [American] had some indirect effect upon some of these and upon other advertisers. However, Federal was soon primarily interested in advertising only in publications of organizations willing to sponsor its services and for practical purposes abandoned efforts to advertise in publications of general circulation. Moreover, many organizations had valid reasons independent of APhA's campaign for refusing to sponsor Federal.

484 F.Supp. 1210. This finding of a failure of proof is amply supported in the record. We find no basis, however, for the inference that American's anti-mail order pharmacy campaign had an "indirect effect" on advertisers. To the extent that this effect emanated from American's general publicity campaign, it is nonactionable under *Noerr* as the incidental result of an effort to influence governmental action.

2. Additional Elements of the Boycott

The court singled out two additional elements of the boycott: the Code of Ethics ban on advertising, and the Code's application even to those who work for nonmembers of American. 484 F.Supp. at 1207. Again, there is insufficient evidence to conclude that these practices caused Federal injury. In states that did not adopt American's Code as state law, the advertising ban affected only members of American; only its members could be subjected to disciplinary action for engaging in activities proscribed by the Code. Federal's proprietors, as nonmembers, were thereby placed under no restraint. In fact, to the extent American's Code restrained advertising of Federal's competitors, it presumably benefitted Federal. In states that did adopt American's Code as state law, Federal may well have been adversely affected, but since the source of the effect was state action Federal has no recourse under the antitrust laws. *See Bates v. State Bar*, 433 U.S. 350, 359–63, 97 S.Ct. 2691, 2696–2698, 53 L.Ed.2d 810 (1977) (restraints upon attorney advertising imposed by Supreme Court of Arizona wielding power of state not subject to attack under the Sherman Act). *See generally Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

The Code provisions that effectively banned employment in mail order pharmacy present a distinct question, for these provisions, in theory at least, could have harmed Federal by hindering its access to pharmacist employees. It is true that Federal was unable to secure certification to hire pharmacist interns, but this resulted from action of the Iowa Board of Pharmacy Examiners and was not attributable to American's conspiracy. Federal's president and chief pharmacist did testify, albeit conclusorily, that Federal had "difficulty at times" in hiring pharmacists (Tr. 1247–50, 1456, 1470). Some applicants said they came despite the advice of the American Pharmaceutical Association, and other persons told the plaintiffs they would not "want to come to work for [Federal's] kind of operation." (Tr. 1249.) However, when it is considered that only one-third of the nation's 125,000 pharmacists belonged to American, and that there is no allegation or proof that Federal's undocumented difficulty in hiring pharmacists caused it actual harm (by, for example, requiring it to turn away business or pay overtime), we think

Federal's evidence is once again too scant to support a finding of injury in fact.

 In the period 1972–77 Federal's sales did decline from $1,619,094 to $1,138,455 and the company did either lose money or make only a marginal profit in each year. 484 F.Supp. at 1212. As the district court noted, however, the existence of antitrust violations was not the only available explanation for this lack of business success. The district court cited a number of factors, including a prolonged strike in the early 1970's by Federal clerical personnel, the existence of legal impediments in most of the states, a general decline in the mail order pharmacy business as a result of more aggressive merchandising by the chain store pharmacies, and the competition of other mail order pharmacies, such as that run for the benefit of the American Association of Retired Persons. 484 F.Supp. 2110–12. Viewing the case as a whole, we are persuaded that the court was clearly erroneous in finding that Federal met its burden of proof on the question of injury in fact.

### 3. Individual Damage Claims

The three proprietors of Federal also claimed damages for injury in their individual business and property. The district court denied each of their claims, because the proofs were not particularized, because Federal compensated them for the time they expended in combatting American's conspiracy, or because injuries to private affairs, unrelated to business considerations, are not recoverable under the antitrust laws. 484 F.Supp. at 1213–14. We find the district court's analysis in these respects free from error and we thus affirm.

### III. CONCLUSION

In sum, although the evidence may support a conclusion that American engaged in a number of activities violative of the spirit of the antitrust laws, those activities were not shown to have materially contributed to Federal's injury, or appear to have harmed Federal only through the intervention of governmental action, which is not subject to the antitrust laws. We thus reverse the award of damages.

*Judgment accordingly.*